CHRISTOPHER JACKMAN, *ET AL.*, PLAINTIFFS-APPELLANTS, v. JOHN M. BODINE, *ET AL.*, DEFENDANTS-RESPONDENTS.

THE ELIZABETH DAILY JOURNAL, *ET AL.*, PLAINTIFFS-APPELLANTS, v. ROBERT J. BURKHARDT, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued September 23, 1969—Decided March 2, 1970.

372

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for *Mr. Arthur J. Sills,* Attorney General of New Jersey.

*Mr. William Miller,* Special Counsel designated by the Attorney General, argued the cause for Apportionment Commission.

*Mr. Hugo M. Pfaltz, Jr.,* argued the cause for the Speaker of the General Assembly of New Jersey (*Messrs. Bourne* and *Noll,* on the brief).

*Mr. Myron H. Gottlieb* argued the cause for appellants *Tutek* and *Soltesz.*

*Mr. James P. Dugan* argued the cause for appellant Lavin.

*Mr. Lawrence I. Lerner* argued the cause for intervenors *Scrimmager* and *Sharper* (*Mr. Harris David* and *Miss Nadine Taub,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. This is another in a series of opinions relating to apportionment of the State Legislature. *Jackman v. Bodine,* 43 *N. J.* 453 (1964) ; 43 *N. J.* 491 (1964) ; 49 *N. J.* 406 (1967); 50 *N. J.* 127 (1967); 53 *N. J.* 585 (1969), *cert.* den. 396 *U. S.* 822, 90 *S. Ct.* 63, 24 *L. Ed.* 2d 73 (1969).

In the last *Jackman* opinion we expressed doubts as to whether the basic plan of apportionment in our State Constitution is compatible with federal constitutional requirements and directed further argument "to the end that the matter may be settled, if possible, well in advance of" the next election which will be held in 1971. 53 *N. J.,* at 588–589. We have since had that further argument.

We should point out that the 1967 and 1969 *Jackman* opinions just cited involved the validity of apportionments made under the "Schedule" of the State Constitution which, for the purpose of electing Senators and Assemblymen in 1967 and "until the 1970 decennial census of the United States shall have been received by the Governor," created 15 Senate districts consisting of one or more counties and directed the creation of Assembly districts on the basis of those Senate districts. *Art. XI,* § *V. pars.* 1–4. We are here concerned with the permanent plan in the State Constitution for subsequent elections. *Art. IV,* § *II, pars.* 1–3. Of course no apportionment has been made under the permanent plan for the 1971 election and hence we can

consider only the face of the plan and what its terms might permit.

I

*Reynolds v. Sims,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 506 (1964), found that the equal protection clause of the Fourteenth Amendment embodied the principle that every man's vote shall equal every other man's vote. In the words of *Reynolds,* 377 *U. S.,* at 565–566, 84 *S. Ct.,* at 1383, 12 *L. Ed.* 2d at 529–530:

And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative apportionment. Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, Brown v. Board of Education, 347 U. S. 483, 74 S. Ct. 686, 98 L. Ed. 573, 38 A. L. R. 2d 1180, or economic status, Griffin v. People of State of Illinois, 351 U. S. 12, 76 S. Ct. 585, 100 L. Ed. 891, 55 A. L. R. 2d 1055, Douglas v. People of State of California, 372 U. S. 353, 83 S. Ct. 814, 9 L. Ed. 2d 811.

And *Reynolds v. Sims* concluded that this demand for equality required that both houses of a bicameral legislature be apportioned upon the basis of one vote per man, notwithstanding that the Federal Constitution itself apportions the Senate upon the basis of equal representation for each State without regard to population. In rejecting this "federal analogy," the Court explained that the federal plan was "conceived out of compromise and concession indispensable to the establishment of our federal republic."

377 *U. S.*, at 574, 84 *S. Ct.* at 1388, 12 *L. Ed.* 2d at 534.[1]
This is not to say that a majority of the people, being also
of the minority in many things, cannot rationally agree
their total security is better served if the will of a house ap-
portioned solely upon population is subject to the "veto"
of a second house apportioned upon another basis. Indeed,
*Reynolds v. Sims* did not denounce such a political plan as
"irrational." Rather the Court held the equal protection
clause struck it down, 377 *U. S.* at 575, 84 *S. Ct.* at 1389,
12 *L. Ed.* 2d at 535:

> This does not necessarily mean that such a plan is irrational or
> involves something other than a 'republican form of government.' We
> conclude simply that such a plan is impermissible for the States under
> the Equal Protection Clause, since perforce resulting, in virtually
> every case, in submergence of the equal-population principle in at
> least one house of a state legislature.

In short, the Fourteenth Amendment was found to have
silently superseded the provision of *Art. IV,* § 4, of the
United States Constitution that "The United States shall
guarantee to every State in this Union a Republican Form
of Government."

In thus rejecting the "federal analogy," *Reynolds v.
Sims* held the equal protection clause affirmatively assured
the majority that its will may not be "frustrated," saying,
377 *U. S.*, at 576, 84 *S. Ct.* at 1389, 12 *L. Ed.* 2d at 535–536:

> If such a scheme were permissible, an individual citizen's ability
> to exercise an effective voice in the only instrument of state govern-
> ment directly representative of the people might be almost as effectively
> thwarted as if neither house were apportioned on a population basis.
> Deadlock between the two bodies might result in compromise and
> concession on some issues. But in all too many cases the more
> probable result would be frustration of the majority will through
> minority veto in the house not apportioned on a population basis,

---

[1] In point of fact, in 1787 the federal plan was an established form
of democratic government, existing in New Jersey and continuing here
until *Reynolds v. Sims* was decided. *Jackman v. Bodine, supra,* 43
*N. J.* at 463–467.

stemming directly from the failure to accord adequate overall legislative representation to all of the State's citizens on a nondiscriminatory basis.

Thus, oddly in a way, the Fourteenth Amendment, which was intended to restrain the will of the majority, was found to insulate the majority will from the restraint of a State Constitution. We need not speculate upon the conceivable reach of the proposition. We refer to it only to highlight the emphasis in *Reynolds v. Sims* upon the broad right of a majority, on a one-man one-vote basis, to have its way.

But it would seem that this concept of majority will could be realized only if all candidates ran at large within the political area directly involved, here, the State. This is so because the election of state legislators by districts necessarily means that the value of a man's vote depends upon the voting complexion of the district in which he lives rather than the voting complexion of the whole electorate. As Mr. Justice Stewart pointed out in *WMCA, Inc. v. Lomenzo*, 377 *U. S.* 633, 750, 84 *S. Ct.* 1418, 12 *L. Ed.* 2d 568, 585 (1964), n. 12, districting conceivably permits a majority in the legislature to be elected by 50%+ of the voters in districts which have 50%+ of the population, so that a little over 25% of the total voters may obtain control. Thus a man's vote may indeed be negated "because of place of residence."

Nonetheless, in an election at large the prevailing party may take all. Besides, if many are to be chosen, the voter may not know all the candidates. Further there are diverse interests which are better represented by candidates elected locally. Doubtless for such reasons, *Reynolds v. Sims* recognized the constitutionality of districting despite its inherent contradiction of the principle that no man's vote may be weighted or diluted by reason of the place where he lives.

It is against this backdrop that the subject of mathematical precision in districting should be considered. We should start with the premise that the very decision to accept dis-

tricting necessarily departed from the ideal of one-man one-vote, and did so to the substantial extent just mentioned. The question, then, is whether it is not tolerable to accept some further, and perhaps countervailing, imbalance in the drawing of district lines if to do so will tend to advance the purpose of districting.

## II

*Reynolds v. Sims* said there may be departures from mathematical equality in drawing district lines in order to maintain the integrity of political subdivisions because (1) adherence to such political lines may deter gerrymandering[2] and (2) local governmental entities are frequently charged with various responsibilities incident to the operation of state government, and hence it is appropriate to provide a voice for that political community.[3] After we held in *Jackman, supra,* 43 *N. J.* 453, that the Senate was malapportioned under *Reynolds v. Sims,* the State Constitution was amended. The plan thereby adopted calls for adherence to county and municipal lines in the formation of districts. *Art. IV, § II, pars.* 1–3.[4]

In *Jackman, supra,* 53 *N. J.* 585, we concluded that *Reynolds v. Sims* was not undercut in this respect by *Kirkpatrick v. Preisler,* 394 *U. S.* 526, 89 *S. Ct.* 1225, 22 *L. Ed.*

[2] "* * * Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisian gerrymandering." 377 *U. S.* at 578–579, 84 *S. Ct.,* at 1390, 12 *L. Ed.* 2d at 537.

[3] "* * * Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions." 377 *U. S.,* at 580-581, 84 *S. Ct.* at 1391, 12 *L. Ed.* 2d, at 538.

[4] As already mentioned, the provisions for the election of legislators "in 1967 and until the 1970 decennial census of the United States for New Jersey shall have been received by the Governor" appear in Art. XI, § V, pars. 1–4. The plan there provided rests upon county lines.

2d 519 (1969), and *Wells v. Rockefeller,* 394 *U. S.* 542, 89 *S. Ct.* 1234, 22 *L. Ed.* 2d 535 (1969). Those cases did raise doubt as to whether adhering to existing political subdivision lines could justify a population deviation, but they dealt with congressional districting whereas *Reynolds v. Sims* dealt with apportionment of a state legislature. There are differences, as well as similarities, between districting for federal and districting for state purposes.

As to gerrymandering,[5] the problem, it is true, is present both in congressional districting and in state legislative districting, but the opportunities are far more numerous with respect to elections to the state legislature. Nor will the computer likely be of aid if political subdivision lines are ignored. Computer-made plans, all mathematically perfect and doubtless numbering in the thousands, will still be keyed to instructions the computer itself cannot supply. Of course the use of existing county and municipal lines does not foreclose partisan selection of district lines, but it does limit that opportunity and does tend to make the political party responsible for the district plan more readily accountable at the polls.

And with respect to the relationship between political entities and the legislative process, we recognize that today the county and the municipality are no longer strangers to federal legislation. Nonetheless the county and the municipality are the meaningful units in state-local relations in many more situations, and elections from districts are the more worthwhile if the county and the municipality are reflected in drawing the district lines.

For these reasons, we concluded in *Jackman v. Bodine, supra,* 53 *N. J.,* at 587–588, that *Kirkpatrick* and *Wells* did not undermine the holding of *Reynolds* that the use

[5] We of course are not speaking of the former practice, so named, which sought partisan advantage by creating districts of unequal population. Rather we speak now of the creation of districts of even absolute numerical equality, but designed for such partisan gain.

of existing political subdivisions may justify a deviation from mathematical equality in state legislative districting. *Cf. Abate v. Mundt*, 25 *N. Y.* 2d 309, 305 *N. Y. S.* 2d 465, 253 *N. E.* 2d 189 (Ct. App. 1969). *cert.* granted 397 *U. S.* 904, 90 *S. Ct.* 929, 25 *L. Ed.* 2d 86 (Feb. 24, 1970).

## III

The question now before us is whether the deviations from mathematical equality authorized by our State Constitution exceed the permissible tolerance.

*Art. IV, § II, pars.* 1–3 may be summarized as follows for the purposes of this and the other questions discussed hereinafter.

Forty senators are to be elected from Senate districts. As we have said, the county is central to the formation of those districts. The Senate district shall be composed, wherever practicable, of one county, and if not so practicable, of two or more contiguous whole counties. The Senate district may be single-member or multi-member. All senators are elected by the entire electorate of the Senate district, with this exception: that if two senators are to be elected from a district consisting of two or more counties, then one senator shall be elected in each Assembly district, drawn as will momentarily appear.

The General Assembly is built upon the Senate plan, with two assemblymen being allotted to the Senate district for each senator allotted to that district. The constituency for the election of one senator and two assemblymen is the same, except that if a multi-member Senate district consists of a single county, all senators run at large within that district while the assemblymen run within Assembly districts carved out of that Senate district, two assemblymen to be elected in each such Assembly district.

As to the Assembly districts, a limitation is stated upon permissible deviations from mathematical equality. *Art. IV, § II, par.* 3, reads in part:

\* \* \* The Assembly districts shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the state as reported in the last preceding decennial census of the United States. Unless necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the state.

Thus the outer limits of deviation within Assembly districts, stated in terms of the ratio between the most and the least populous districts, is 1.5 to 1. Since Assembly districts are carved out of Senate districts, it follows that the deviations per Senator as among Senate districts will not exceed that ratio.

These constitutional provisions obviously embrace a plan, and one which cannot be called capricious. Nonetheless, as is clear from *Reynolds v. Sims,* it is not enough that a plan is rational. Equal protection of the law also requires mathematical equality subject only to unavoidable deviations for acceptable reasons and then only if the deviations are within tolerable limits. The question is whether we can say that the ratio of 1.5 to 1 is inherently intolerable.

A canvass of the decisions reveals that only two need be discussed: *Swann v. Adams,* 385 *U. S.* 440, 87 *S. Ct.* 569, 17 *L. Ed.* 2d 501 (1967), and *Kilgarlin v. Hill,* 386 *U. S.* 120, 87 *S. Ct.* 820, 17 *L. Ed.* 2d 771 (1967).

In *Swann,* the ratio in the Senate was 1.30 to 1, and in the other house was 1.41 to 1. The judgment sustaining the apportionment was reversed, but not because the ratios were inherently intolerable. It was reversed "for the failure of the State to present or the District Court to articulate acceptable reasons for the variations among the populations of the various legislative districts with respect to both the senate and house of representatives." 385 *U. S.,* at 443–444,

87 *S. Ct.* at 572, 17 *L. Ed.* 2d at 504. Proponents of the plan claimed support in prior decisions, including *Lucas v. Forty-Fourth General Assembly of Colorado,* 377 *U. S.* 713, 84 *S. Ct.* 1459, 12 *L. Ed.* 2d 632 (1964), and *Harrison v. Schaefer,* 383 *U. S.* 269, 86 *S. Ct.* 929, 15 *L. Ed.* 2d 750 (1966). In *Lucas,* *t*he Court had said that a house was "arguably" apportioned on a population basis where the ratio was 1.7 to 1 (377 *U. S.,* at 730 and at 739, n. 32, 84 *S. Ct.* 1459, 12 *L. Ed.* 2d at 643 and at 649, n. 32), and in *Harrison* the Court affirmed without opinion *Schaefer v. Thomson,* 251 *F. Supp.* 450 (D. Wyo. 1965), which had upheld an apportionment with a ratio of 2.08 to 1. *Swann* noted that in neither case was the ratio issue raised or ruled upon, 385 *U. S.,* at 444–445, 87 *S. Ct.* 569, 17 *L. Ed.* 2d at 505, but *Swann* did not say that either ratio was incontestably bad.

In *Kilgarlin,* the ratio involved was 1.31 to 1. The Court was "doubtful" that the deviations could be justified but again declined to decide whether that was so, saying "we need not reach that constitutional question, for we are not convinced that the announced policy of the State of Texas necessitated the range of deviations between legislative districts which is evident here" (386 *U. S.,* at 123, 87 *S. Ct.* at 822, 17 *L. Ed.* 2d at 775). In fact, the Court noted, there were two other plans, prepared upon the very thesis the State asserted, which "produced substantially smaller deviations from the principles of *Reynolds v. Sims.*" (386 U. S., at 124, 87 *S. Ct.* at 823, 17 *L. Ed.* 2d at 775).

 Thus it cannot be said that the ratio of 1.5 to 1 authorized by our State Constitution is inherently bad. But we stress again, as we did in *Jones v. Falcey,* 48 *N. J.* 25, 37 (1966), that there is no range of deviation "within which a State may maneuver, with or without reason"; that "the command is to achieve equality, and a limited deviation is permissible only if there exists an acceptable reason for the deviation"; and "the deviation may not exceed what

the purpose inevitably requires." And when a deviation does appear, the burden is the State's to justify it. 48 *N. J.,* at 40. In short, there must be selected the best plan the constitutional thesis will permit, and the best plan is the one with the least population deviation. *Koziol v. Burkhardt,* 51 *N. J.* 412, 416 (1968). *Jones* and *Koziol* involved congressional districting, but these principles are equally pertinent to state legislative districting. *Jackman v. Bodine, supra,* 49 *N. J.,* at 415, 418. See *Swann, supra,* 385 *U. S.,* at 445, 87 *S. Ct.* 569, 17 *L. Ed.* 2d, at 505; *Kilgarlin, supra,* 386 *U. S.,* at 123–124, 87 *S. Ct.* 820, 17 *L. Ed.* 2d, at 775.

A subsidiary question with respect to districting is whether adherence to ward lines can justify any mathematical departure from equality. The issue was raised with respect to the Assembly lines drawn in the Senate district comprising Hudson County. We are satisfied that the municipal ward, although conceivably useful with respect to the problem of gerrymandering, does not for that reason, or for any other reason, advance the purposes of apportionment sufficiently to justify population inequality, and hence, with respect to future elections, no deviation will be defensible on that account.

We add that we adhere to the view we heretofore expressed that assemblymen must be allocated to the Senate districts on the principle of equal proportions notwithstanding the provision of *Art. IV, § II, par.* 3, that assemblymen be allocated on the basis of two for each senator allotted to such districts. See *Jackman, supra,* 49 *N. J.,* at 416–418; *Jackman, supra,* 50 *N. J.,* at 129–130. The alternative, as there pointed out, could be to give one county an assemblyman at the expense of another county and thereby to accentuate an imbalance in the Senate. Under our decision an odd number of assemblymen may be allotted to a Senate district. When this is so, one or more may have to run at large within the Senate district. We see

no affront in that situation to the requirement for voter equality.

## IV

Another matter should be discussed even though we can only await further developments with respect to it.

We refer to the multi-member district, which will probably continue to be a feature of future plans under our State Constitution. The election of all the allotted senators by all the voters of the single county obviously serves the thesis of adhering to county lines. Nonetheless the criticism is made that the individual in such a county has a stronger voice within the legislative hall because he has multiple representatives.

There is another aspect. An election at large within the multi-member district means the majority wins all whereas if there were subdistricts, a minority group might elect a senator. That the majority may win all seats does not run against the ideal of one-man one-vote. As we pointed out in I above, that ideal is achieved by elections at large and therefore is furthered with respect to all voters within a multi-member district if each vote is pitted against every other vote throughout the district. Hence the question seems to be, not whether in this respect the multi-member district denies the principle of one-man one-vote, but whether such districting generates other inequalities equally violative of the equal protection clause.

The drawing of district lines with the affirmative intent to disadvantage a minority interest would deny equal protection. Realistically, however, it is difficult to prove the presence of such a purpose. It more likely will appear only that single-member districts would or might enable a minority group to elect someone. Thus the question emerges whether the Constitution affirmatively requires single-member districts to the end that minorities will have the maximum chance to elect their own representa-

tives. And this question arises whether the multi-member district consists of several counties[6] or of only one.

■ We assume a legislature may not be apportioned on racial, religious, national, ethnic, or economic lines, i. e., by allotting a *pro rata* number of representatives to each identifiable group to be elected exclusively by the voters of that group no matter where they reside. Apart from the impossibility of recognizing all such conceivable interests, an apportionment upon that basis would run against the central concept of *Reynolds v. Sims* that the apportionment of population shall be made only in terms of geography, with no notice whatever of constituencies beyond their numerical count. Of course in practical politics minority interests nonetheless have a voice, for obviously in the selection of a slate a political party cannot be indifferent to a minority, at least if its members are sufficiently numerous. But the question is whether the equal protection clause requires single-member districts to insure the maximum chance of election by minorities, and so requires even though such districting may benefit only a minority which is concentrated geographically and even though the value of the votes of others within the district who are not members of that minority may thereby be effectively nullified.

■ At the moment, the multi-member district, as such, cannot be said to be invalid under decisions of the United States Supreme Court. But the subject is far from settled. While *Fortson v. Dorsey,* 379 *U. S.* 433, 439, 85 *S. Ct.* 498, 13 *L. Ed.* 2d 401, 405 (1963), upheld such districting, it added that "It might well be that designedly *or otherwise,* a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated, it will be time enough to consider whether

---

[6] Under our Constitution, senators run in Assembly districts in that situation. *Art.* IV, § II, par. 2; *Jackman v. Bodine, supra,* 49 N. J. at 415–416.

the system still passes constitutional muster" (emphasis added). See particularly *Chavis v. Whitcomb,* 305 *F. Supp.* 1364 (S. D. Ind., July 28, 1969), and *Mann v. Davis,* 245 *F. Supp.* 241, at 245–246 (E. D. Va. 1965), aff'd without opinion, *sub. nom. Burnette v. Davis,* 382 *U. S.* 42, 86 *S. Ct.* 181, 15 *L. Ed.* 2d 35 (1965); and see also *Burns v. Richardson,* 384 *U. S.* 73, 88, 86 *S. Ct.* 1286, 16 *L. Ed.* 2d 376, 388 (1966); *Kilgarlin v. Hill, supra,* 386 *U. S.,* at 125, n. 3, 87 *S. Ct.* 820, 17 *L. Ed.* 2d, at 776, n. 3; *Davis v. Cameron,* 238 *F. Supp.* 462, 466 (S. D. Iowa 1965); *Buckley v. Hoff,* 243 *F. Supp.* 873, 878 (D. Vt. 1965); *Stout v. Bottorff,* 246 *F. Supp.* 825, 829 (S. D. Ind. 1965); *Baker v. Carr,* 247 *F. Supp,* 629, 637–638 (M. D. Tenn. 1965); *Abate v. Mundt, supra,* 25 *N. Y.* 2d at 316–317, 305 *N. Y. S.* 2d 465, 253 *N. E.* 2d, at 192–193, *cert.* granted 397 *U. S.* 904, 90 *S. Ct.* 929, 25 *L. Ed.* 2d 86 (Feb. 24, 1970); Banzhaf, "Multi-Member Electoral Districts —Do They Violate the 'One Man, One Vote' Principle," 75 *Yale L. J.* 1309 (1966); "Reapportionment," 79 *Harv. L. Rev.* 1226, 1258–1261 (1966); Dixon and Hathaway, "The Seminal Issue in State Constitutional Revision: Reapportionment Method and Standards," 10 *William and Mary L. Rev.* 888, 903–904 (1969).

The multi-member district issue is quite distant from the issue generated by the crazy-quilt of unequal districts which led to *Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1 (1960), and *Baker v. Carr,* 369 *U. S.* 186, 82 *S. Ct.* 691, 7 *L. Ed.* 2d 663 (1962). It may not be difficult to decide whether an apportionment scheme is irrational or is indifferent to an explicit apportionment command of a Constitution. There are known standards of reference for such a decision. The issue as to the validity of a multi-member district is strikingly different. The question is really whether the equal protection clause provides an affirmative design of a democratic government, and if so, whether that design demands single-member districts. Until the United States Supreme Court speaks, there will be no de-

pendable standard of reference. The question goes to the essence of the State Constitution's apportionment plan,[7] and since the United States Supreme Court has expressly reserved the matter for future consideration, we think it unwise and perhaps needlessly disruptive for us to anticipate its answer.

Subject to the qualifications stated in this opinion, the State Constitution's apportionment plan is adjudged to be valid with respect to the several challenges considered herein.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.

---

[7] As to the Senate, the Constitution expressly calls for elections at large within a district consisting of a single county. Since 40 Senators are to be elected from 21 counties, it is likely there will be such districts in future plans. The multi-member issue may also be involved with respect to Assembly districts, since our Constitution calls for the election of *two* Assemblymen from each district.