**J. O. WOLD, Jr., et al., Plaintiffs,**

v.

**Forrest H. ANDERSON, Governor of the State of Montana, Frank Murray, Secretary of State of the State of Montana, and the 42nd Legislative Assembly of the State of Montana, Defendants.**

**Civ. No. 939.**

United States District Court,
D. Montana,
Nov. 22, 1971.

Russell K. Fillner, of Sandall, Moses & Cavan, and Thomas E. Towe, of Towe, Neely & Ball, Billings, Mont., for plaintiffs.

Robert L. Woodahl, Atty. Gen. of Mont., Charles H. Dickman, Asst. Atty. Gen., Helena, Mont., and Charles C. Lovell, Chief Counsel, Great Falls, Mont., for defendants.

Before BROWNING, Circuit Judge, and JAMESON and SMITH, District Judges.

## ORDER AND OPINION

PER CURIAM:

In an order, D.C., 327 F.Supp. 1342, entered June 11, 1971 this court declared unconstitutional the legislative reapportionment plan enacted by the first extraordinary session of the Forty-second Session of the Montana Legislative Assembly, Chapter Ex. 3 of the Session Laws of 1971. This plan provided for 55 senators from 29 districts and 104 representatives from 28 districts, with a maximum deviation between the smallest and largest senator districts of 37.-06% and between the smallest and largest representative districts of 23%. We held that the defendants had failed to sustain their burden of showing that differences of this magnitude were necessary or "grounded in acceptable state policy."

 Acting on the premise that reapportionment is in the first instance the proper function of the legislative assembly[1] and taking judicial notice of

---

1. In Ely v. Klahr, 1971, 403 U.S. 108, 114, 91 S.Ct. 1803, 29 L.Ed.2d 352, the Supreme Court again reaffirmed the rule enunciated in Reynolds v. Sims, 1964, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506. "(L)egislative reapportionment is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." This rule while originating in political philosophy is soundly grounded in reason. Many factors are involved in any apportionment plan. Not only are size and homogeneity of the districts relevant but also such things as the location of shopping centers, the pattern of roads, and the areas of coverage of newspapers, daily and weekly, radio and T.V., affect

the fact that the Montana Legislative Assembly was again meeting in extraordinary session, we reserved jurisdiction to make such orders as might be appropriate following that session.

In Extraordinary Session II the Montana Legislative Assembly enacted Chapter Ex. 2–8, Montana Session Laws of 1971, R.C.M.1947 §§ 43–106.6 to 43–106.9, providing for a senate of 50 members and a house of representatives of 100 members from 23 districts. Portions of five counties—Carter, Valley, Yellowstone, Sweet Grass and Missoula—were included in different districts from the remainder of the county.[2]

Under the reapportionment plan enacted as Chapter Ex. 2–8, the average population per senator is 13,888. The maximum deviation occurs between District 15 (Glacier, Toole, Pondera, and Teton Counties) with a population of 14,674, which is 786 persons or 5.66% above the average, and District 16 (Flathead County) with a population of 13,153, which is 735 persons or 5.29% below the average. The average deviation is 2.75%.[3]

On July 2, 1970 plaintiffs filed a motion that the court declare Chapter Ex. 2–8 unconstitutional and "make a reapportionment plan of its own for the upcoming elections to the Constitutional Convention and until a better plan can be passed and implemented by a future session of the Montana Legislative Assembly." In a supporting brief plaintiffs stated that four other plans had been considered by the Legislative Assembly with smaller deviations, including H.B. 46, which "breaks county lines only 5 times, but has a maximum deviation of only 3.3 per cent."

In an order entered July 26, 1971 the court, calling attention to the imminence of the elections for the selection of delegates to the Constitutional Convention, approved the use of the provisions of Chapter Ex. 2–8 for the election of delegates to the Convention. In connection with further consideration of the constitutionality of Chapter Ex. 2–8, the order requested the defendants to submit in "specific detail the 'legitimate state considerations' which 'justify (the) deviations from population equality' reflected in the Legislative Reapportionment Plan * * * in the light of House Bill No. 46 * * * which break the boundaries of fewer counties and, according to plaintiffs results in substantially less deviation from population equality."

Supplemental affidavits and briefs were filed by the respective parties. A hearing was held on October 4, 1971. It was the position of the plaintiffs at the hearing that both Chapter Ex. 2–8 and H.B. 46 were unconstitutional and that only through single-member districts could a reapportionment plan avoid "a built-in bias in favor of the cities."[4]

the communications within the district, and meaningful representation is dependent upon communication. A legislature composed of men and women who are local in the sense that the areas they represent are relatively small have a knowledge growing out of their experience which qualifies them as experts on all of the factors relevant to the considerations which would justify some degree of departure from a strict application of the one-man, one-vote rule.

2. The Act also provides that multi-member districts may be divided into single member districts if favored by a majority of the registered voters of the district at an election called upon petition of 8% of the voters, the division to be made by the county commissioners of the county or counties affected.

3. Of the 23 legislative districts, the variation from the average is 1% or less in six districts, from 1.1% to 2% in four districts, from 2.4 to 3.9% in five districts, from 4 to 4.9% in six districts, and over 5% in two districts, i. e., Districts 15 and 16. In number of persons the deviation from the average ranges from 39 to 786. The average deviation is 380.

4. In brief filed May 25, 1971 plaintiffs contended, inter alia, that Chapter Ex. 3 of the Session Laws of 1971 contained a "built-in bias" against voters living in the three most populous counties—"Yellowstone, Cascade and Missoula."

Before considering the question raised in the order of July 26, 1971, it seems advisable to restate and clarify our holding in the order of June 11, 1971 that plaintiffs had failed to sustain their burden of proving that the provision for multi-member districts is unconstitutional. We relied upon Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, which held that multi-member districts are not "inherently invidious and violative of the Fourteenth Amendment" and that the three-judge district court which struck down an apportionment scheme for Indiana had "misconceived the Equal Protection Clause." 403 U.S. at 160, 91 S.Ct. 1858.

Plaintiffs urge reconsideration of our prior holding and the adoption by the court of a plan for single-member districts. They presented with their brief a plan (which was considered and rejected at each of the three sessions of the Montana Legislative Assembly) in which the state is divided into 47 single-member senator districts and 94 single-member representative districts, with a maximum deviation of 6.29%.[5]

Plaintiffs argue that a per curiam order entered by the Supreme Court on June 3, 1971 in Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268, is controlling and that this court should accordingly reconsider its holding that the proof is insufficient to sustain the multi-member districts in Chapter Ex. 2–8. We do not so construe the effect of that order. In Connor v. Johnson a three-judge court had held a reapportionment plan enacted by the Mississippi Legislature invalid and had issued its own plan, which included both single-

member and multi-member districts. It found that single-member districts would be ideal for Hinds County but that it would not have time to divide the county into districts before the 1971 election. Recognizing that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter", the Supreme Court concluded that the district court had ample time to devise single-member districts for Hinds County and ordered the district court to do so. 402 U.S. at 692, 91 S.Ct. 1760.

Four days later Whitcomb v. Chavis was decided, and there is no reference in any of the opinions in that case to Connor v. Johnson. The Chief Justice, and Justices Black and Blackmun, who dissented from the Connor order, and Mr. Justice Stewart joined in the majority opinion by Mr. Justice White.[6] The opinion reviews prior decisions holding that multi-member districts are not *per se* illegal. Recognizing that the validity of multi-member districts is justiciable, the Court said: "But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements. We have not yet sustained such an attack." 403 U.S. at 144, 91 S.Ct. at 1869.

After reviewing all of the cases in which the Supreme Court has considered whether multi-member districts are constitutionally impermissible, we adhere to our prior holding that plaintiffs have failed to prove that the multi-member districts "unconstitutionally operate

---

5. At the October 4 hearing plaintiffs called as a witness Professor Ellis L. Waldron of the Political Science Department of the University of Montana who presented a plan for 45 senators and 90 representatives, which would break county lines in approximately half of the districts, provide for multi-districts in the most populous counties and for single member dis-

tricts for senators and either single member or two member representative districts, and which would result in a maximum deviation of approximately 3%. This plan was not considered at any of the three sessions of the Montana Legislative Assembly.

6. Mr. Justice Harlan wrote a concurring opinion.

to dilute or cancel the voting strength of racial or political elements." [7]

We turn now to the claim that Chapter Ex. 2–8 offends the constitutional guidelines. We note first of all that our concern is related solely to the arithmetical variances from the ideal. It is not suggested that such variations as are present are brought about by any plan or scheme to discriminate against any geographic area or any class of people.[8]

Devising a satisfactory apportionment plan for Montana with minimal deviations is not without difficulty. We note judicially that Montana has an area of 145,587 square miles and a population of 649,409. It has 56 counties ranging in population from 675 in Petroleum County (down from 894 in 1960) to 87,367 in Yellowstone County (up from 79,016 in 1960). The five counties with the least number of persons—Petroleum, Golden Valley, Treasure, Wibaux and Carter—many of which are of substantial size, have a combined population of 6,096 (down from 7,633 in 1960). See Table 9, 1970 Census of Population, Montana.

In justification for the existing deviations the defendants have presented substantial evidence that under established state policy there are advantages in maintaining county lines as far as possible. The county is a meaningful and the most commonly used political subdivision in many federal, state and local relationships. While this factor could not, in our opinion, justify the substantial deviations in Chapter Ex. 3, the desire to preserve the integrity of political subdivisions and contiguity in voting districts are legitimate state considerations which may properly be considered, among other factors in determining whether Chapter Ex. 2–8 is constitutionally permissible.

An affidavit of the chairman of the special subcommittee of the Montana Senate which drafted the plan enacted as Chapter Ex. 2–8 sets forth the guidelines under which the committee operated.[9] Initially an effort was made to avoid breaking any county lines. When this proved impossible without increasing unduly the size of the legislature, the committee devised a plan which would break county lines as little as possible and still take account of natural barriers and communications, travel and geographical factors. Where county lines were broken, census enumerator division lines were followed. Census enumerator divisions were chosen over their component census enumerator districts because "a division line is much more definable and accurate than a district line" and because, with the use of divisions "there was less opportunity for political gerrymandering or 'me too' changes." [10] There was a rational basis for using census enumerator divisions. The population of the divisions may be determined with exactitude, their boundaries are "natural" e. g. roads, streams or county boundaries, and they were composed by independent authority.

The affidavit recites further that the committee decided that the size of the Legislative Assembly should be limited to 50 senators and 100 representatives because there "was a definite feeling among the electorate that the size of the

7. There is no basis for any claim of racial discrimination. It is no doubt true, as plaintiffs contend, that in Yellowstone County it is difficult for persons residing in certain areas to be elected to the Legislative Assembly and that at present the multi-member districts tend to favor one political party. In other counties, such as Silver Bow and Cascade, the plan tends to favor the other political party. The proof does not, however, reach the dimensions required to hold the plan violative of the Equal Protection Clause, as construed in Whitcomb v. Chavis.

8. Any deliberate deviation based upon racial or economic factors would probably be invidious. See Abate v. Mundt, 1971, 403 U.S. 182, 187, 91 S.Ct. 1904, 29 L.Ed.2d 399.

9. An affidavit of the majority leader of the Senate supports generally the affidavit of the committee chairman.

10. Plaintiffs' expert witness, Dr. Waldron, does not agree with the conclusion.

legislature should be cut." The size of a state legislature is a matter particularly appropriate for determination by the state itself. The state has a vital interest in the efficiency of its legislative process and it is generally recognized that smaller legislatures tend to be more efficient. Certainly the Equal Protection Clause does not forbid a state legislature from considering size as a factor.

Under the bill as introduced and passed by the House of Representatives District 15 consisted of Glacier, Toole, Pondera and Teton Counties less the Babb and Glacier National Park census enumerator divisions of Glacier County, which were added to Flathead County to comprise District 16. It was amended in the Senate to transfer the Babb and Glacier Park area from District 16 to District 15. Prior to the amendment the maximum deviation was 9.84% instead of the 10.95% in the bill as amended and enacted.

The Babb area is separated from Flathead County by Glacier National Park and a mountain range. The area is located on the Blackfeet Indian Reservation and its interests are more readily identifiable with those of Glacier County. From the standpoint of the area's economy, Indian population, geography, and communications outlets, we can find justification for the Senate amendment, even though it increased the maximum deviation by 1.11%. The Blackfeet Nation in an *amicus curiae* brief supports the inclusion of the Babb area in District 15 although the effect was to dilute somewhat the strength of votes cast in District 15.

In light of this factual background are the deviations created by Chapter Ex. 2–8 constitutionally permissible under the guidelines established by the Supreme Court? In Abate v. Mundt, supra, the Court sustained the apportionment of a county legislature which involved a maximum total deviation from population equality of 11.9%. The Court said in part:

"It is well established that electoral apportionment must be based on the general principle of population equality and that this principle applies to state and local elections, Avery v. Midland County, 390 U.S. 474, 481 [88 S. Ct. 1114, 1118, 20 L.Ed.2d 45] (1968). 'Mathematical exactness or precision is hardly a workable constitutional requirement,' Reynolds v. Sims, 377 U.S. 533, 577 [84 S.Ct. 1362, 1389, 1390, 12 L.Ed.2d 506] (1964), but deviations from population equality must be justified by legitimate state considerations, Swann v. Adams, 385 U.S. 440, 444 [87 S.Ct. 569, 572, 17 L.Ed.2d 501] (1967). Because voting rights require highly sensitive safeguards, this Court has carefully scrutinized state interests offered to justify deviations from population equality." 403 U.S. at 185, 91 S.Ct. at 1906.

The dissenting opinion of Mr. Justice Brennan in Abate v. Mundt expressed the view that the Court had reaffirmed "all of the principles of Reynolds v. Sims * * * and its progeny," but had refused to apply those principles to the apportionment scheme in that case, and that the Court's "recent decisions in Avery v. Midland County, 390 U.S. 474 [88 S.Ct. 1114, 20 L.Ed.2d 45] (1968); Kirkpatrick v. Preisler, 394 U.S. 526 [89 S.Ct. 1225, 22 L.Ed.2d 519] (1969); and Wells v. Rockefeller, 394 U.S. 542 [89 S.Ct. 1234, 22 L.Ed.2d 535] (1969), require reversal." 403 U.S. at 187, 91 S.Ct. at 1908. Plaintiffs here have relied heavily on Kirkpatrick v. Preisler and Wells v. Rockefeller, both of which involved reapportionment of congressional districts.[11] While the Supreme Court has not expressly held that the mathematical precision required in those cases for congressional apportionment is not applicable to legislative apportionment,[12]

---

11. In Montana, with two congressional districts, there is no difficulty in complying with Kirkpatrick and Wells in apportioning congressional districts.

12. It is true, as plaintiffs point out in their brief, that in Ely v. Klahr, supra, the Court held that the district court had "properly concluded" that a plan allowing

the Court in a number of decisions beginning with Reynolds v. Sims has clearly recognized that, "Somewhat more flexibility may * * * be constitutionally permissible with respect to state legislative apportionment than in congressional districting." Reynolds v. Sims, 377 U.S. at 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506.

The decisions in Abate v. Mundt, Reynolds v. Sims, and Swann v. Adams, all recognize that "variations from a pure population standard might be justified by such state policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines", and that a particular variation from the norm in one state "has little bearing on the validity of a similar variation in another State." Swann v. Adams, 385 U.S. at 444–445, 87 S.Ct. at 572.[13]

The decisions speak in terms of percentages when passing upon the permissible limits of deviation, but we think that the principal difference between Abate v. Mundt, supra, which approved an 11.9% deviation, and Kirkpatrick v. Preisler, supra, which condemned a 5.97% deviation, lies in the fact that in one case the problem involved 12,000 to 13,000 people per person to be elected while in the other the problem involved over 400,000 per person to be elected. It is not that 12,000 people may be subjected to discrimination more readily than 400,000 but simply that as the numbers involved decrease the percentages of variance caused by permissible factors causing discrimination rise abruptly.[14] The ideal is absolute equality, but we know that this is not possible. It is not possible today to devise a plan achieving the ideal because today the 1970 census is already inadequate to achieve absolute equality because of population shifts.[15] By the time of elections for the Montana Legislative Assembly in 1972 those inadequacies will be enlarged.

The maximum variation under Chapter Ex. 2–8 is between Districts 15 and 16. As indicated, the ideal is 13,888 persons per senator. District 15 is underrepresented, having 786 too many people, and District 16 is overrep-

---

deviations among legislative subdistricts of up to 40% from ideal until 1971, and up to 16% thereafter, "was invalid" under Kirkpatrick v. Preisler, 1969, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519, and Wells v. Rockefeller, 1969, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 530, "since the legislature had operated on the notion that a 16% deviation was de minimis and consequently made no effort to achieve greater equality." 403 U.S. at 111, 91 S.Ct. at 1805. On the other hand, see Jackman v. Bodine, 1970, 55 N.J. 371, 262 A.2d 389, 394, cert. den. 1970, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 87, where the court concludes that "Kirkpatrick & Wells did not undermine the holding of Reynolds that the use of existing political subdivisions may justify a deviation from mathematical equality in state legislative districts."

13. In Swann v. Adams the Court recognized that "mathematical exactness is not required in state apportionment plans" and that "de minimis deviations are unavoidable," but concluded that "variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases

suggests that differences of this magnitude will be approved without a satisfactory explanation grounded on acceptable state policy." 385 U.S. at 444, 87 S.Ct. at 572.

14. The need for more flexibility in legislative apportionment is readily apparent in Montana. With a population of 694,409 the average for two congressional districts is 347,204. A 1% deviation is 3,472 persons. A 1% deviation in the legislative apportionment plan under consideration is 139 persons. If registered voters or even persons eligible to vote were used, the number of persons would be substantially less.

15. Between 1960 and 1970 there was a marked population shift in Montana. Fifteen counties gained in population, the gains ranging from 0.5% to 44.1%. Forty-one counties lost population, the losses ranging from 2.5% to 32.8%. The largest gains in population occurred in the cities of Bozeman, Billings, Helena, Missoula, and Great Falls. The urban population increased 9.5% while the rural population decreased 3.7%.

resented, having 735 too few. Yet if the population trends of the decade between 1960 and 1970 continue, by 1975 District 16 will be underrepresented and District 15 will be overrepresented.[16] We do not suggest that the variations in Chapter Ex. 2–8 will be corrected by population movements (some of the variations will probably increase), but we do think that an average population deviation per senator of 380 persons or a maximum deviation of 786 persons in one district cannot be the basis for a declaration that a legislative plan of reapportionment is unconstitutional when deviations of that magnitude can and in all probability will be introduced in the course of one year by factors over which no one has any control. Thus District 18, composed of most of Missoula County, gained 323.5 persons per senator per year between 1960 and 1970. Had the apportionment been exactly equal in 1960, deviations (assuming that the increase was evenly spread over the ten-year period) approximating the average created by Chapter Ex. 2–8 would have occurred in one year and in three years the maximum deviation would have been exceeded. While expressed in percentages the deviations of Chapter Ex. 2–8 may appear to be large, the fact is that only a blind pursuit of equality as an ideal unaffected by any other considerations will achieve a much greater equality where the number of people involved is as small as here. We conclude that the deviations from population equality in Chapter Ex. 2–8 are justified by legitimate state considerations and are within tolerable limits.

There remains for consideration the question of whether H.B. 46 offered a better plan with less population deviation.

H.B. 46 was formulated on the same general basis as Chapter Ex. 2–8, except that census enumerator districts were used as the "building blocks" where county lines were broken. A lesser population deviation, i. e., a total of 3.3%, was achieved through (1) increasing the size of the legislative assembly by 10%; (2) the use of larger multi-member districts; (3) less consideration of natural barriers and travel, communications, and economic factors in combination of counties; and (4) combining small rural counties with large urban counties in the two most populous districts.

Chapter Ex. 2–8 provides for 50 senators and 100 representatives; H.B. 46, for 55 senators and 110 representatives. Chapter Ex. 2–8 has 23 districts, and H.B. 46 has 19. Chapter Ex. 2–8 provides for six senators and 12 representatives in the largest districts; H.B. 46, for seven senators and 14 representatives.

Under H.B. 46 Carter, Custer, Fallon, Prairie, Wibaux, Dawson and McCone counties and a portion of Richland county—an area in excess of 17,000 square miles [17]—are combined in one district with three senators and six representatives. Lewis and Clark, Powell, Deer Lodge and Jefferson counties and most of Broadwater county are combined into a 9,000 square mile—five senator, ten representative district. Flathead and Glacier counties, combined into a four senator, eight representative district, are separated by a mountain range.

Golden Valley, a rural county with a population of 931, is combined with Yellowstone county, an urban county with a population of 87,367, and Choteau, a rural county with a population of 6,473, is combined with Cascade, an urban county with a population of 81,804, into districts with seven senators and 14 representatives. If there is merit in preserving the integrity of counties as political subdivisions, this is not a desirable result.[18]

---

16. On the basis of the 1960–1970 trends District 15 is losing population at a rate of 253 per senator per year, and District 16 is gaining at a rate of 216 per senator per year.

17. An area greater than the combined areas of Connecticut, Massachusetts, Rhode Island and Delaware.

18. As we have noted, plaintiffs do not urge the court to follow H.B. 46. On

H.B. 46 arrives at mathematical precision at the expense of other factors which were properly considered in enacting Chapter Ex. 2–8. We conclude that the legislative assembly made a good faith effort to comply, as nearly as practicable, with the one man, one vote principle.

In view of our conclusion it is unnecessary to consider the new plan offered by the plaintiffs at the October 4 hearing or the respective merits of multi and single member districts. Our function is limited to determining whether the plan enacted is constitutionally permissible. Within this framework policy decisions should be made by the legislative assembly or the forthcoming Constitutional Convention.

Plaintiffs' motion is denied, and the reapportionment plan enacted as Chapter Ex. 2–8, Session Laws of 1971, is held to be constitutionally permissible.

This opinion shall constitute the court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

the contrary, except for the smaller deviation from the average population, they consider H.B. 46 more objectionable than Chapter Ex. 2–8, particularly in the built-in bias in favor of the cities.