**K. Ken McBRIDE, John Buttelman, Helen Kerr, Joyce Sandquist, Vernon Westlake, Thomas J. Kamp, Sonja Marchwick, Bradley Johnson, Raymond Tocci, Calvin Dunbar, on behalf of themselves and all other citizens and electors of Gallatin County and the State of Montana, Plaintiffs,**

**v.**

**Eugene MAHONEY, Jim Pasma, Joann Woodgerd, Louise Galt, John Kuhr, Individually and in their official capacities as members of the Montana Districting and Apportionment Commission; James Waltermire, Secretary of State of Montana; and the State of Montana, Defendants.**

**No. CV 83–25–BV.**

United States District Court,
D. Montana,
Butte Division.

Oct. 4, 1983.

Donald E. White and Karl P. Seel, White & Seel, Bozeman, Mont., for plaintiffs.

Judy Browning, Asst. Atty. Gen., Mike Greely, Atty. Gen., Helena, Mont., for defendants.

Before ANDERSON, Circuit Judge, and BATTIN and SMITH, District Judges.

## OPINION AND ORDER

**PER CURIAM:**

In this case a group of Gallatin County citizens (plaintiffs) challenge the 1983 reapportionment plan finally adopted by the Montana Districting and Apportionment Commission (Commission).

It appears without dispute that the Commission was appointed in the manner prescribed by the Montana Constitution[1] and that the Commission followed the procedure outlined by the Montana Constitution.[2]

---

**1.** Mont. Const. art. v, § 14(2).

**2.** Mont. Const. art. v, § 14(3).

The 1983 reapportionment plan prescribed a House of Representatives (House) of 100 members. Under the constitution the number of House districts equals the number of the members of the House. The Senate districts are composed of two contiguous House districts.

The Commission reapportioned the State on the basis of the data provided by the 1980 federal decennial census.[3] The total population of the State of Montana, according to that census, is 786,690. The population of an average (ideal) House district is 7,867. The population of an average (ideal) Senate district is 15,734.

An analysis of the plan shows that the average deviation from the ideal for all 100 House districts is 3.06%. House District 2,

which has the greatest deviation over the ideal, deviates by + 455 people. The relative deviation is + 5.78%. House District 98, which has the greatest deviation below the ideal, deviates by − 406 people. The relative deviation is − 5.16%. The total deviation is 10.94%.[4] The average deviation for Senate districts is 2.40%, and the total deviation is 10.18%.

Gallatin County has a population of 42,865 people, according to the 1980 census. That population, divided by the population of an ideal House district (7,867), entitled Gallatin County to 5.4 House seats. The Commission created five House districts (Nos. 76, 77, 78, 79, and 80) wholly within Gallatin County. The deviations in these districts were as follows:

As to House District 2 (deviating by + 5.78%) the Commission said:

> [T]he Commissioners adopted the alternative discussed here because the plan received general support from the residents of Lincoln County. This preference was based on Eureka's compatibility with the rural areas of the county in contrast to its incompatibility with Libby (with which it was joined under the rejected alternative). The Commission expressed a preference for creating one semi-urban district and one rural district in the county.

As to House District 98 (deviating by − 5.16%) the Commission said:

> House Districts 95–98 in Yellowstone County are contained in definable areas and are separated from the county's other districts by geographic features—the Yellowstone River and the Rimrocks. These four districts also are distinguishable from the majority of the Yellowstone County districts in that they primarily are comprised of non-city residents. (Of the 29,895 people in the four districts, only 5,961 are located in the city limits.)
>
> The above factors led the Commission to develop district proposals using the Rimrocks and the Yellowstone River as boundaries, despite the fact that the population of the four districts therefore averaged 7,473.75 (or − 5% deviation). The low deviation in this contained area also may have been acceptable to the Commission because the average all-Yellowstone County house district population was 7,574 or − 3.72%. The reasons for this low mean county deviation were based on regional considerations, including respect for county boundary integrity.

(Footnote omitted.)

3. Plaintiffs contend that the population of Gallatin County is growing rapidly and that the Commission should have considered that potential growth. Subject to a motion to strike, we received evidence as to population trends. While population trends have been noted in the cases (see Wold v. Anderson, 335 F.Supp. 952, 958–59 (D.Mont.1971)), there is no case authority for the proposition that population projections must be considered in the reapportionment process, and in innumerable cases the apportionments based upon census data alone have been approved. To the extent that population projections may be considered at all, the rule, as stated in Kirkpatrick v. Preisler, 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519 (1969), is:

> We recognize that a congressional districting plan will usually be in effect for at least 10 years and five congressional elections. Situations may arise where substantial population shifts over such a period can be anticipated. Where these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them. By this we mean to open no avenue for subterfuge. Findings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an ad hoc, manner.

We have some reason to question the absolute accuracy of the population projections offered, but we need not reach that problem. The fact is that the Commission did not consider population projections, and no one presented to it any data which would have enabled it to apply population projections throughout the state in a "systematic manner." We now grant the motion to strike.

4. This total House deviation was explained by the Commission in its report to the Legislature.

| | | |
|---|---|---|
| House District 76 | – | – 1.89% |
| House District 77 | – | + 4.69% |
| House District 78 | – | + 4.61% |
| House District 79 | – | + 5.24% |
| House District 80 | – | + 5.03% |

The Commission also created House District 74 by combining an area in Gallatin County having 2,139 residents, all of Madison County having 5,448 residents, and an area in Yellowstone National Park having 29 residents. In House District 74, the deviation from the ideal is – 251 people, and the relative deviation is – 3.19%.

Plaintiffs contend that the deviation of 10.94% over the entire state deprives the people of Montana of the equal protection of the laws. The law is that:

> [E]lectoral apportionment must be based on the general principle of population equality and that this principle applies to state and local elections, *Avery v. Midland County*, 390 U.S. 474, 481 [88 S.Ct. 1114, 1118, 20 L.Ed.2d 45] (1968). "Mathematical exactness or precision is hardly a workable constitutional requirement," *Reynolds v. Sims*, 377 U.S. 533, 577 [84 S.Ct. 1362, 1389, 12 L.Ed.2d 506] (1964), but deviations from population equality must be justified by legitimate state considerations, *Swann v. Adams*, 385 U.S. 440, 444 [87 S.Ct. 569, 572, 17 L.Ed.2d 501] (1967). Because voting rights require highly sensitive safeguards, this Court has carefully scrutinized state interests offered to justify deviations from population equality.

*Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971). The decision in *Brown v. Thomson*, —— U.S. ——, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), reaffirmed the rule that, with respect to state legislatures, deviations may be justified by legitimate state objectives.[5] Apportionment plans where there have been deviations in excess of 10% have been approved in many cases.[6]

The deviation of more than 10% in the approved plan "creates a prima facie case of discrimination and therefore must be justified by the State." *Brown*, —— U.S. at ——, 103 S.Ct. at 2696. The questions then arise as to what the legitimate State objectives are and whether consideration of them justifies the deviations shown.

In its early meetings, the Commission adopted the following criteria: (1) that, insofar as possible, consideration should be given to existing governmental boundaries; (2) that geographic boundaries must be respected, unless such boundaries should impede voting; (3) that communities of interest be considered as they relate to a particular area; (4) that existing district boundaries be given consideration wherever practical; and (5) that the Commission stay within a plus or minus 5% deviation from the ideal.[7]

In our opinion the criteria established by the Commission did state legitimate State objectives. Accordingly, we believe that the deviations between House District 2 and House District 98, with the consequence of an overall State deviation of 10.94%, resulted from a consideration by the Commission of legitimate state objectives. We believe that the deviations are

---

**5.** See also *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

**6.** See, e.g., *Brown v. Thomson*, —— U.S. ——, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (Wyoming House of Representatives, maximum deviation 89%); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (Virginia House of Representatives, maximum deviation 16.4%); *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971) (Rockland County, New York, maximum deviation 11.9%); *Wold v. Anderson*, 335 F.Supp. 952 (D.Mont.1971) (Montana Senate, maximum deviation 10.95%);

*League of Nebraska Municipalities v. Marsh*, 253 F.Supp. 27 (D.Neb.1966) (Nebraska House of Representatives, maximum deviation 19.65%); *Sims v. Baggett*, 247 F.Supp. 96 (M.D.Ala.1965) (Alabama Senate, maximum deviation 25.7%).

**7.** The exhibit containing the minutes of the Commission meeting shows that each criterion was the subject of a separate motion made during the Commission meeting. As a result, there is some inconsistency in the phraseology. Moreover, it is apparent that the exhibit is not a verbatim rendition of the minutes but rather a narrative statement of what was contained in them.

justified and that the people of Montana are not deprived of the equal protection of the law.

We now turn to the contention that the Commission did not follow its own criteria. It is apparent, however, that the criteria were not inflexible. It is clear from the wording of the criteria and the Commission discussions that they were considerations only and that the conflicts between the criteria as they existed within a district and as they existed between districts had to be balanced in arriving at a plan embracing the entire State.

When the Commission started with Gallatin County, it was presented with a clear conflict between Criterion No. 1 (that governmental boundaries should not be broken) and Criterion No. 5 (that there should not be more than a plus or minus 5% deviation). Gallatin County, according to the 1980 census, has a population of 42,865. If five districts had been created in Gallatin County, the resulting deviation from the ideal would have been + 8.97%. If six districts had been created in Gallatin County, the deviation from the ideal would have been – 9.19%. In our opinion the Commission was justified in determining that Gallatin County had to be broken and some part of it had to be joined with some other area to form a House district.

Once it was decided that the Gallatin County lines had to be broken, then the Commission faced a different problem: What area in another county should be joined with an area in Gallatin County? This question involved conflicts in the criteria between the areas in Gallatin County and the areas to be joined.

The Gallatin County Representatives presented the Johnson-Marchwick plan [8] which considered only Gallatin, Madison, and Broadwater Counties without regard for the balance of the State. This plan was tentatively adopted at the Commission meeting of April 16, 1982. While trying to fit the Johnson-Marchwick plan into the overall pattern, the technical staff found that problems were caused by the "ripple effect" of the Johnson-Marchwick plan. The term "ripple effect" may be explained in this way: If 2,500 people are taken from District A and moved to District B, then to create a new District A, 2,500 people must be taken from some other area. If that area happens to be District C, then the new District C must borrow from some other district, and so on. All that this really means is that before people are moved from one district into another, the Commission must look at all of its criteria to determine what the effect of the movement would be, *i.e.*, to determine what, if any, conflicts between criteria are caused by the movement and how to resolve them.

The staff studied the Johnson-Marchwick plan and several alternatives to it and considered the ripple effect caused by each of them. The recommendations of the staff were presented to the Commission, and on the basis of those recommendations, the Johnson-Marchwick plan and all of its alternatives were rejected, and the plan before us was approved.

We now look at the individual criteria as they relate to the selection of an area to be joined with Gallatin County.

*As to Criterion No. 1:*

The approved plan breaks one county line. Any other plan presented would have broken more county lines.

*As to Criterion No. 2:*

In the approved plan a continental divide separates Madison County from Gallatin County. In general, people in Gallatin County in House District 74 have to travel farther to get to the cities in Madison County than to get to the cities in Gallatin County. In view of the fact that voting does not necessarily involve travel between counties, it was the function of the Commission to decide what weight should be given the geographic factor.

*As to Criterion No. 3:*

Plaintiffs claim that the approved plan places together people with no community

---

8. This plan would have joined an area in Gallatin County containing about 5,000 people with an area in Broadwater County containing about 2,500 people.

of interest. There is evidence to the effect that the Johnson-Marchwick plan would have placed together people with a greater community of interest in the sense of shopping centers, media coverage, and other similar considerations than does the approved plan. On the other hand, both the Gallatin Canyon part of District 74 and Madison County are concerned with tourism. Big Sky, a well-known resort, and an entrance to Yellowstone National Park at West Yellowstone are located in Gallatin Canyon. The Madison River in Madison County is a nationally famous blue-ribbon trout stream, and tourism is a main concern of Virginia City, a one-time territorial capital of Montana. It could be that, in terms of the kinds of legislation which would affect the tourist industry, the people of House District 74 in Gallatin and Madison Counties have a greater real community of interest than do the people of Gallatin and Broadwater Counties who were joined in the Johnson-Marchwick plan. We note here that, if the Commission had determined that the community-of-interest criterion between the people joined in the Johnson-Marchwick plan was greater than that between the people joined in the approved plan, then the Commission would have had to reconcile the conflict between Criterion No. 3 and Criterion No. 1 (the governmental-boundaries criterion).

*As to Criterion No. 4:*

The 1971 reapportionment plan (1971 Mont.Laws, 2d Ex.Sess., chs. 2–8) created twenty-three multimember House districts containing 100 representatives. Gallatin and Park Counties comprised District 11 and had six representatives. When the Commission in 1983 decided on a House of 100 members,[9] elected from single-member districts, it was, of course, necessary to redraw all the House district lines. While multimember districts are not per se unconstitutional,[10] certainly a Commission might find that single-member districts are to be preferred over multimember districts. *See Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Connor v. Johnson,* 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). It was obviously not practical to respect House district boundaries created in 1971.

*As to Criterion No. 5:*

The Johnson-Marchwick plan did result in less deviation from the ideal for the House districts in Gallatin County than did the approved plan. But this comparison ignores any ripple effect caused by the Johnson-Marchwick plan. This factor was considered by the staff and by the Commission. The importance of the difference in the deviations between the two plans was another factor to be balanced with all of the other considerations.

The minutes of the Commission meetings show that each of the alternatives presented involves problems similar to those presented by the plaintiffs and that the adoption of any feasible plan would have to some extent departed from the objectives set by the criteria. It was the function of the Commission to interpret its own criteria—to decide, for instance, what constituted a community of interest and then, looking at not just one county but all counties potentially affected, to balance the interests involved and arrive at a conclusion.[11]

We believe that the Commission made a good-faith effort to balance all of the legitimate State objectives in the apportionment of Montana.

> A federal court must defer to the legislature's judgment about the significance of these factors in the reapportionment process if the state has enacted an otherwise valid reapportionment plan. *See Reynolds v. Sims,* 377 U.S. 533, 577–81, 84 S.Ct. 1362, 1389–91, 12 L.Ed.2d 506 (1964); *Ferrell v. Oklahoma,* 339 F.Supp. 73, 82 (W.D.Okla.), *aff'd,* 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972).
>
> 548 F.Supp. 133.

**9.** The size of the Legislature was a legitimate State concern. *See Wold v. Anderson,* 335 F.Supp. 952, 957 (D.Mont.1971).

**10.** *Id.* at 955–56.

**11.** In the case of *Cline v. Robb,* 548 F.Supp. 128 (E.D.Va.1982), the court, speaking of communities of interest and geographic considerations, said:

This opinion constitutes the findings of fact and conclusions of law of the court.

Let judgment be entered denying the plaintiffs all relief.