**LEAGUE OF NEBRASKA MUNICIPAL-ITIES, a Non-Profit Nebraska Corporation, et al., Plaintiffs,**

v.

**Frank O. MARSH, as Secretary of State of the State of Nebraska and as a Member of the State Board of Election Canvassers of the State of Nebraska, et al., Defendants,**

and

**Nebraska State American Federation of Labor and Congress of Industrial Organizations, et al., Intervenors.**

**Civ. No. 551 L.**

United States District Court
D. Nebraska.
April 12, 1966.

Herbert M. Fitle, City Atty., Omaha, Neb., Ralph D. Nelson, City Atty., Lincoln, Neb., for plaintiffs.

August Ross, Robert E. O'Connor, Omaha, Neb., for intervenors.

Clarence A. H. Meyer, Nebraska Atty. Gen., Lincoln, Neb., Robert A. Nelson, Sp. Asst. Atty. Gen., Lincoln, Neb., for defendants.

Before JOHNSEN, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

PER CURIAM.

The preceding history of this litigation on reapportionment of the Nebraska Unicameral Legislature may be found in 209 F.Supp. 189, 232 F.Supp. 411, and 242 F. Supp. 357.

We have continuingly retained jurisdiction in facilitation to the plaintiffs and the intervenors of opportunity for bringing before us any apportionment made which should be claimed by any of them to deprive him of equal protection in his right of suffrage and opportunity for representation.

The matter is before us now on a supplemental petition filed by some of intervenors (seven voters of Douglas County, two of Lancaster County, one of Hall County, and one of Scotts Bluff County) and on the adoption of the intervenors' position by one of the plaintiffs (a voter of Lancaster County), seeking to have us declare invalid the latest reapportioning effort of the Legislature, known as LB 925 (Neb.Sess.Laws 1965, ch. 22, p. 171), which became effective on August 18, 1965.

The original complaint and the original petition of intervention were filed in 1962.[1] Up to that time, since 1935, when

---

1. While the original docketing title of the suit has been continued to be used for purposes of identification, we early made dismissal of the League of Nebraska Municipalities as a plaintiff, and of the Nebraska State AFL-CIO, a labor or-

the Legislature had set up 43 legislative districts [2] in implementation of a constitutional amendment adopted in 1934 creating Nebraska's nonpartisan unicameral system, no change had been made in number or the boundaries of the State's legislative districts. The 1960 census showed the population of Nebraska to be 1,411,330. This represented an increase of less than 33,500 for the thirty-year period since the 1930 census, which had been used as a basis in the 1935 districting. While the population of the State thus had not changed substantially in number, there had occurred, as the 1960 census showed, a decided shifting in the location of much of it from rural to urban areas. In example, one of the districts in Douglas County had by 1960 come to have five times as many people as the least populous rural district of the State. See further 209 F.Supp. at 193.

It was such substantial disparities, of ranging extents, alleged to exist generally between the urban and rural areas of the State which prompted and were made the basis of this suit. The original complaint characterized the situation as one of "gross disproportions of representation of the Nebraska voters residing in cities and villages". This was expanded in a supplemental complaint to charge that "the rural areas and interests are in complete and unassailable control of the legislative department of the government of the State of Nebraska to the total exclusion of the urban areas and interests". Similarly, in the original petition of intervenors, whose concern with urban representation was primarily related to the componency of the labor vote therein, it was alleged that there had been "a

purposeful and systematic plan of members of the Nebraska Legislature since 1945 to discriminate against a geographical class and deny them the equal protection of the law". And in the attack made by intervenors in a supplemental petition upon the first attempt of the Legislature to redistrict, in which use had been made, under Nebraska constitutional mandate, of territorial area as a material factor in representational allotment, it was pointed out that there were large geographical extents in the State which had a population of less than one person per square mile.

We need not review here the two previous reapportionment attempts which have been engaged in by the Legislature since this suit was commenced, and only such incidental reference will be made to them as can serve a relevant purpose in our discussion of LB 925.[3]

LB 925 sets up 49 legislative districts, each with one elective member. On an equal division of the population into 49 districts, each would consist mathematically of 28,802 people. No such absolute mathematical division is however possible, even with a crossing of county lines, unless a reapportionment were to be made wholly mechanically and in total disregard of the State's existing election structure, with its object of providing orderliness, convenience, and inducement for voters to exercise their franchise privilege.

In Nebraska, status and identification for suffrage purposes is governed by Article VI, Section 1, of the State Constitution. Residence in the State for six months and within the county and voting precinct for terms provided by law is re-

ganization, as an intervenor, because of their lack of voter status. Only individuals have been permitted to remain as plaintiffs or as intervenors. See 209 F.Supp. at 191–192.

2. The constitutional amendment provided · that "The Legislature shall consist of not more than fifty members and not less than thirty members".

3. In the first reapportionment enactment, territorial extents had been made a fac-

tor in representational allotment, because of a provision of the Nebraska Constitution so requiring. In the second enactment, the Legislature had not engaged in any splitting of a county for joinder of a part of it to some other county or counties. The failure to do any such splitting was primarily because of the opinion expressed by the Attorney General of the State at the time that such a crossing of county lines would be violative of the Nebraska Constitution.

quired. The Legislature by statute has provided for residence in the county for forty days and the precinct for ten days prior to the election. See § 32–477, Neb. R.R.S.1943. "The division of a county into suitable voting precincts is devolved upon the county board of a county." State ex rel. Eble v. Leavitt, 33 Neb. 285, 49 N.W. 1097.

In the establishing of these units as part of the electoral process and on a basis such that the distances involved will not cause voters to stay away from the polls, the precincts throughout the State, with the existing divergent densities, naturally will have considerable population variances.[4] Hence, it is inevitable, as above suggested, that no legislative districting made with established precinct recognition, whether or not county lines are crossed, will be able to achieve an exact population division.[5] Even minimizing the variations between districts by taking into account the ties of relationship and interest which voters of a precinct have with voters of their own county or with voters of adjoining precincts in counties other than their own, variations will still exist and mathematical exactness can never be obtained with voting precincts of unequal population.

The law does not require that counties be massacred to achieve mathematical exactness. Where important interests of those even in remote corners of a county are identical, whether in trade, business, ethnic origin, or otherwise, with residents throughout the county, county lines are entitled to be respected within proper measure of discretion. The constitutional mandate contained in Article III, Section 5, is that "county lines shall be followed whenever practicable".[6] County lines are not to be used, however, to support or maintain a plan of "invidious discrimination."

On this basis, LB 925, different than the preceding apportionment measure, engaged in the splitting of 7 counties, so that there came to exist 11 districts out of the 49 in which some precincts from a county were conjoined to another county or counties. In these instances, where the Legislature deemed it absolutely necessary to cross county lines to get at "some equality", it appears to have sought to make the apportionment such as would cause the joinder made not to deprive them of all similarity of representational interest.[7]

We have referred to these affective aspects preliminarily in approach to the

---

4. In the sparsely populated areas of the State, precincts can exist of as few as 15 voters, where there is involved territory of "not less than one township of land, and not more than four townships lying contiguous". Neb.R.R.S.1943, § 23–157. Even the establishment of such precincts could necessitate the traveling by a voter of up to 12 miles or more in order to exercise his franchise.

5. Thus, a reapportionment plan prepared by a political scientist in purely mathematical approach, with recognition, however, of precinct structure, was placed in evidence illustratively, in which the maximum variations among districts had been held down to 2.2%, but in which there was a scattering of precincts from counties into as many as three legislative districts. In these instances, the precincts so scattered into the second and third districts constituted only an insignificant portion of the population of the districts.

6. One legislator emphasized in committee hearing the natural and general desire which could exist to have a county "represented as a whole". Similarly, another said: " * * * I hate to see three or four or five voting precincts cut off one county and thrown into another (district) * * *". There were expressions also by voter-witnesses, such as that by one from a county which, under a proposal considered, would have had precincts scattered into parts of three districts: " * * * We would certainly prefer to be in the same district with people of our own interest".

7. Illustratively, in the joinder made by the committee of a part of Cass County and of Otoe County to an area of Lancaster County (lying outside the City of Lincoln), a member explained on the floor that it was felt as to this situation that the residents of the western part of these counties "are more oriented to Lancaster [County] from an economic standpoint than they are to the eastern part of [their own] county.

questions of (1) whether LB 925, as a response to our reapportionment mandate, represents "a good-faith effort to establish districts substantially equal in population"; and (2) whether if the measure can be regarded as constituting such a responsive and not a pretextual effort, so that it is entitled to full judicial consideration, it is capable of being said "after an evaluation of (the) apportionment plan in its totality",[8] that what has been done does not involve invidious discrimination on the situation as a whole.

An examination of the legislative history of LB 925 leaves no question in our mind but that the Legislature was conscientiously endeavoring to respond to our reapportionment mandate and to effect a constitutional solution to the problem within such relationship as it believed there could properly be of voting right to representational opportunity. If it had ignored every other political reality except existing precinct structure and had otherwise dealt with the situation in purely mathematical approach, it would appear that the lowest result that it would have been possible for it to come forth with, as is indicated in footnote 5, supra, would be a population variance of up to 2.2%.

We do not believe, however, that the shattering, scattering and mechanical joinder of precincts which would have to be engaged in to produce that attainable mathematical result is legally required, or that it would be meritoriously desirable in its local significances, or that it would be likely to be representationally satisfactory to the voters of the State. Some reasonable margin of variance beyond this can properly exist, we think, where it is apparent that there has been a good-faith attempt to have the redistricting provide as large and as nearly equal a quantum of individual voting power as possible, but at the same time not to have it constitute a purely mechanical result, which realistically would cut off

representational opportunity and leave only abstract franchise privilege.

■ There is no occasion, however, to carry this general discussion further, and we shall turn to a specific consideration of LB 925 itself. The first thing which is entitled to be noticed is that there is not urged against it, nor do we think there could be, the charge on which the suit was originally predicated in the situation then existing—the unfair representational strength of the rural areas as against the urban areas.

This charge, in the institution of the suit, had its principal focus upon the two metropolitan areas of the State—Douglas County (Omaha) and Lancaster County (Lincoln). On a mathematical apportionment, Douglas County, which had only 7 legislative representatives at the time, would be entitled to 11.9. Under LB 925, it has been given 12. Similarly, Lancaster County, which had only 3 legislative representatives, but would mathematically have been entitled to 5.3 representatives, has been given 6, except that as to one district, which lies wholly outside the City of Lincoln, there have been conjoined some precincts from Cass County and Otoe County, as referred to in footnote 7, supra, so as to give it a population of 27,970.

Of the only 9 other cities in the State, which have a population of more than 10,000, Grand Island (25,742) has been placed in a district consisting of a part of Hall County and containing 30,266 people; Hastings (21,142) in a district consisting of the whole of Adams County and containing 28,944 people; Fremont (19,-698) in a district consisting of the whole of Dodge County and containing 32,471 people; North Platte (17,184) in a district consisting of the whole of Lincoln County and containing 28,491 people; Kearney (14,210) in a district consisting of the whole of Buffalo County and a part of Hall County and containing 28,014 people; Norfolk (13,640) in a district consisting of the whole of Madison County

8. Lucas v. Forty-Fourth Colorado General Assembly, 377 U.S. 713, 735, 84 S.Ct. 1459, 1473, 12 L.Ed.2d 632.

and a part of Pierce County and containing 29,545 people; Scottsbluff (13,-377) in a district consisting of a part of Scotts Bluff County and containing 30,-061 people; Columbus (12,476) in a district consisting of Platte and Nance Counties and containing 29,125 people. Thus, in 6 of these 9 districts, the cities named have a population majority so that there would exist an urban voting control as against the rural areas of the district.[9]

In examining urban representational aspect further, we shall treat the one district in Lancaster County which lies entirely outside the City of Lincoln as being of rural rather than urban interest. This would leave existing under LB 925 a total of 24 districts out of the 49 in which the election of legislators would be subject to urban voting control. Carrying the matter a bit farther, if the population of all of the 24 cities in the State of over 5,000 people (there are 13 cities between 5,000 and 10,000) be added together and their voting strength be admeasured on this basis, it would be found that the most that this could give rise to in representational right would be the election of 19 legislators. But on the districting made, LB 925, as noted above, provides opportunity for urban-vote control of the election of 24 legislators. Thus, there can be no room for any contention of attempted or existing discrimination under LB 925 against urban voting right or representation as such.

This is as far as it should be necessary to go on that question. While there further are in the State 19 cities of between 2,500 and 5,000 population, these are so scattered in their geographical situation that there would be no way in which their existence could make possible the establishing of any more districts of urban voting control. Manifestly, the districting which has occurred as to them thus also is without any possible basis for any claim of urban discrimination being involved in the districting made of them.

Equally too, or even more so, is this true as to all the smaller cities, the towns, and the villages of the State. Indeed, as to these minor municipalities, it might be added that in their primarily rural relationship and dependence, the fact probably is that they are possessed more of a rural representational interest than an urban one.

Although the matter of the grossly disproportionate representation which existed in favor of rural interest was where Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, and the law suit here began, the question of reapportionment goes, of course, beyond this or any other class or group aspect. In simple broad test, as stated by the Supreme Court, it is a question of whether "an individual's right to vote for state legislators * * * is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State". Reynolds v. Sims, 377 U.S. 533, 553, 568, 84 S.Ct. 1362, 1365, 12 L.Ed.2d 506.

But the problem is not one of mere exercise in arithmetic, nor is the result one that must be tested by "mathematical nicety". Some variances from the population average for equal districting are, as we have indicated, inherently inescapable in the creation of any political subdivisions. And some margin beyond this can also properly, we think, come to exist on the elements which naturally enter into the course of almost all legislative action.

Thus, as referred to above, we believe that judicial consideration of the reapportioning effort here is not without room to take account of the concern of some legislators not to have county lines crossed, when the natural local desire is to maintain county representational unity and of their concern for having such districting as might be made afford, if possible, opportunity or feeling of securing representational voice and not give rise in its effect to mere naked voting privilege.

---

9. The district in which the City of Scottsbluff is located contains also the nearby City of Gering (4,585), and it is on this combined basis that we regard urban voting control as existing in this district.

Nevertheless, as to such extents of variance as are capable of raising a facial question, it must be able to be concluded that the Legislature has engaged in good-faith effort and not in attempted evasion, and that the result itself is not, on over-all consideration and appraisal, such a substantial quantitative dilution of individual voting right as to have the qualitative effect of invidious discrimination legally in the general situation.

Turning on this basis to the variances which exist under LB 925, there are 44 districts out of the 49 which have a variance of less than 7.0% from the mathematical population average of 28,802. 33 of these are variances of less than 5.0% from the mathematical average. As to the 5 districts which have a variance of more than 7.0%, there is one of 7.13% above the mathematical average; one of 7.60% above; one of 8.61% above; one of 11.94% above; and one of 12.74% above. It will be noted that these five variances, which constitute the largest that exist, are all above the mathematical average. Thus, they could not afford basis for an attack by the residents of any other districts (which the intervenors on the supplemental petition before us and the single plaintiff here involved all are), except as the excesses would have been given such a narrow counterpart spread that they operated to provide some single or a few districts with a significantly heavier voting spread than the others.

As we stated in 232 F.Supp. at 413, "It is to be emphasized that we are here concerned only with the dilution, if any, of voting strength within the various Unicameral legislative districts, and if such is found whether it is substantial in its effect upon the individual voters within those districts".

Looking at the excess variances and their counterpart spread, it will be found that there are 24 districts of higher population and 25 districts of lower population than the strictly mathematical aver-age. The range of these variances has previously been set out. In their total amount and counterpart significance, they involve a voting and representational right to approximately 0.9 of a legislator, or roundly a single legislator. Stated differently, on a mathematically-exact apportionment, the population of the 24 districts which have a margin over the mathematical average would have been entitled to one more legislative representative, and the population of the 25 districts under the mathematical average to one less. In other words, if the Legislature were to be required and would be able to make an absolutely mathematical apportionment and to ignore every other factor, it would have had to spread the population of the 24 districts exceeding such average into 25 districts, and to compact the population of the 25 districts under such average into 24.[10]

This one-legislator representational difference as between the over and the under districts could hardly be said, on the population spread involved, to constitute a substantial difference in individual voting power among the citizens of the State generally, nor between those of the over and the under districts generally. To this should be added that the over and under districts both have scattering throughout the State so that there is involved no common geographical location in respect to either of them, nor does either appear to have any uniting aspect otherwise (as, for example, rural versus urban interest), which could make the one-legislator difference have some representational significance between them.

Finally, we come to a consideration of whether, notwithstanding the aspects which have been discussed, it still is required to be held that there exists such an extreme of peak and valley variance as on its face to give rise to constitutional invalidity. The argument here is that on the greatest variation above (12.74%) and the greatest variation below (6.91%) a difference exists of 19.65% between the voting strength of residents of the State,

10. This is, of course, only hypothetical demonstration, since the Legislature could engage in wholly different territorial alignment for districting purposes.

and that such an extent of difference is so discriminatory as to be constitutionally intolerable.

■ We do not believe that such an abstract legal conclusion on significance and consequence is required. The limited operational scope of the difference, the basis on which it rests, and its individual-voter representational significance in the situation seem to us to afford room in the circumstances for the judgment of discretion which the Legislature exercised. The 19.65% alleged variance is, of course, a dilution only against the residents of Dodge County (District No. 15). And even as to them, on the general variation spread among the districts, as referred to above, it is a percentage which does not have validity in relation to the voting strength of the majority of the State's population but only to a minor fraction thereof. Further, on the one-legislator representational difference which the variances involve in their whole, it would represent at most only a one-eighth part of the one-legislator voting and representational right which could exist in the total of 24 districts, as previously discussed. This is hardly of such realistic individual-voter significance as to constitute a legal absolute. And even more persuadingly does this reality impress when viewed in the light of the object, basis and consideration on which the Legislature acted.

The legislative history shows that a proposal had been made and was considered on the floor for detaching some precincts from Dodge County and attaching them to another district. The Legislature apparently concluded that there was a preference on the part of the residents of the precincts which would be so affected not to be lopped off from their own county and joined to another district in which they had no attachment interest. Thus, the legislator from the district stated on the floor that he had visited with the people in the area proposed to be shifted, and they expressed the feeling that they would be in a better position representationally to be left as they were.[11]

It has been further urged upon us that, if LB 925 should be approved, "then there can be little doubt that all future apportionment plans would have that 20% difference built into them". We do not regard this argument as having any basis, and we need only add that no implication is entitled to be made by the Legislature of that nature from our decision. Our appraisal here, as we have pointed out, is made only in relation to the immediate situation and to the significance of the variances involved in the whole of that relationship.

The variances which may properly creep into a reapportionment situation are not subject to definition, formula or guideline for general application. Variances can have different significances and different effects in different situations. As the Supreme Court cautioned in Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, where the District Court had engaged in expression on the extent to which it felt that population-variances could legally go:

"Our affirmance of the decision below is not meant to indicate approval of the District Court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population. In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose leg-

11. What has been said as to District No. 15 is applicable also to District No. 41 (Valley, Greeley, Boone, Sherman and Howard Counties), in which the Legisla-ture arrived at a similar conclusion in regard to slivering off some precincts from Boone County.

islative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination".

As with everything else, the experience which the Legislature has now had in reapportionment efforts should make easier its task in this field in the future and should enable it to produce a result that can have such acceptance as not to cause it to be subject to assailment federally. The question of the right under the Nebraska Constitution to cross county lines in districting, which apparently bothered and left some of the legislators with a hesitancy in relation to LB 925, has since been answered by the Nebraska Supreme Court in Carpenter v. State, 179 Neb. 628, 139 N.W.2d 541.

It may not be amiss to observe that on the population shifts which appear to have continued in Nebraska from rural to urban and suburban areas since 1960, the redistricting made by LB 925 may be proved by the 1970 census to be no longer valid. Whether in such a situation the provision of the Nebraska Constitution, that "The Legislature may redistrict the state from time to time, but not more often than once in ten years", would permit the Legislature to engage in a redistricting on its own accord at its 1971 session, or not to do so until ten years after the enactment of LB 925, is a matter which is not for our concern or expression. If the 1970 census shows such an existing inequality in apportionment as to amount to a federal violation, the situation is, of course, open to challenge in the federal courts.

Our decision makes unnecessary any consideration of the request that not only should LB 925 be declared to be unconstitutional, but that there should be overthrown in relation to it the right of the legislators in the odd-numbered districts of the State, under Art. III, Sec. 7 of the Nebraska Constitution and § 32–304.02 Neb.R.R.S.1943, to hold office until 1969. Under this constitutional amendment, adopted in 1962, legislators were given a four-year term, with provision for staggering, and under the statute referred to, enacted in 1963, the four-year term was made to apply to the odd-numbered districts commencing with the 1964 election and to the even-numbered districts commencing with the 1966 election. These are aspects and incidents of state government which had a right to be and were engaged in without relation to the matter of population reapportionment. Even if LB 925 had been held invalid by us, we would not in the present situation have felt warranted in extending that result to a disrupting of this structure and functional aspect of state government.[12] Whether in such a situation of invalidity this would be true, if the lengthening of terms and their staggering had been a part of LB 925 itself and were intended to be in furtherance of its reapportionment scheme, there is no occasion for us to consider.

This opinion is being filed in supplement to and on the reservation of jurisdiction in the previously-entered judgment and decree herein dismissing the supplemental petition of intervention and the action itself in all its aspects. The decree was entered promptly after the hearing herein, because of the urgency of the matter in relation to the closing

---

12. In Carpenter v. State, supra, 179 Neb. at 636, 139 N.W.2d at 546, the Nebraska Supreme Court said of the contention urged before it as to the effect of this staggering of legislative terms: "The plaintiff contends that this [staggering] deprives voters of their right to vote for their representative for a period of 2 years * * *. With the staggered terms of Nebraska legislators provided for under Article III, section 7, of the Constitution of Nebraska, it would be a practical impossibility to redistrict without this effect. The regulations regarding the exercise of the elective franchise provided for under the Constitution of Nebraska, and as affected by L.B. 925, are reasonable, uniform, and impartial, and should not be treated as subverting or impeding the exercise of the elective franchise".

date of March 11, 1966, for filings for the 1966 primary election. We provided that the judgment should become effective upon the filing of this opinion. In order to leave no confusion or question on the record, concurrently with the filing of this opinion reaffirmation and re-entry of the previous judgment and decree will also be made.

The suit in all its aspects shall accordingly stand dismissed.