55 P.3d 863

In the Matter of the Petition Challenging Legislative Redistricting, Application for Injunctive Relief and Application for Writ of Prohibition.

BINGHAM COUNTY, a political subdivision of the State of Idaho, the Board of Bingham County Commissioners, Devaughn Shipley, Wayne Brower, Cleone Jolley, Petitioners,

v.

IDAHO COMMISSION FOR REAPPORTIONMENT and Pete T. Cenarrusa, Secretary of State of the State of Idaho, Respondents.

In the Matter of the Petition Challenging Redistricting Plan L91 and Request for Permanent Injunction of the Implementation of Redistricting Plan L91.

Diane Bilyeu, Donna Boe, Roger Chase, Larry W. Ghan, Joni Sorensen And A. Lin Whitworth, Petitioners,

v.

Idaho Commission for Reapportionment and Pete T. Cenarrusa, Secretary of State of the State of Idaho, Respondents.

Nos. 28153, 28197.

Supreme Court of Idaho, Boise, February 2002 Term.

March 1, 2002.

J. Scott Andrew, Blackfoot, Prosecuting Attorney for appellant Bingham County.

Racine, Olson, Nye, Budge & Bailey, Pocatello, for appellant Bilyeu, et al. W. Marcus W. Nye argued.

Hon. Alan G. Lance, Attorney General, Boise, for respondent Pete T. Cenarrusa. Thorpe P. Orton argued.

Hopkins, Roden, Crockett, Hanson & Hoopes, Idaho Falls, for respondent Idaho Commission for Reapportionment. C. Timothy Hopkins argued.

SCHROEDER, Justice.

This is the second challenge to the Idaho Commission on Reapportionment's proposed redistricting plan. This Court previously voided the first plan on the basis that the 10.69% deviation in representation between districts, without justification, violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Issues present in this case are whether the plan submitted by the Commission in response is unconstitutional under both state and federal constitutions, as well as in violation of several Idaho statutes.

## I.

### FACTS AND PROCEDURAL HISTORY

In 1994 the Idaho State Constitution was amended to create a bipartisan citizens' commission that was assigned the task of redistricting. The Idaho Commission on Reapportionment (the Commission) is required to file a plan approved by four of its six members with the Secretary of State within at least ninety days of organization, which is to remain in effect until a new plan is required or amended by court order. The Idaho legislature enacted statutes providing guidance to the Commission in the task of redistricting. Idaho Code §§ 72–1501–1508.

On August 28, 2001, the Commission filed Plan L66 with the Secretary of State. According to the 2000 Census, Idaho's population is 1,293,953 people. With 35 legislative districts in the state, the ideal district population is 36,970 people. In Plan L66, the least populated district contained 34,928 people, 5.52% below the ideal size. The largest district contained 38,881 people and was 5.17% above the ideal size. The maximum population deviation in that plan was, therefore, 10.69%, which was presumptively discriminatory under U.S. Supreme Court case law. The State did not advance a 'rational state policy' necessary to justify a population deviation of over 10%. The Court held the plan unconstitutional and ordered the Commission to reconvene and adopt a plan that met constitutional standards of equal protection.

On January 8, 2002, the Commission adopted Plan L91, which contains a population deviation even greater than that contained in the original plan. The Commission prepared a Final Report, including Findings and Conclusions that explain the rationale behind the adoption of that particular plan. The largest district is 6.26% above the ideal size with 39,286 people, while the smallest district is 5.53% below the ideal size with 34,927 people. The maximum population deviation in Plan L91 is 11.79%, which, as noted, is greater than the population deviation in the plan that was previously voided by this Court.

The Bingham County Board of County Commissioners (Bingham County) filed a petition challenging Plan L91. Subsequently, residents of Bannock County filed a petition also challenging the Plan. Residents of Madison County, the petitioners in the first redistricting appeal, have filed an amicus brief urging the Court to adopt a specific plan. The Court has consolidated these petitions for hearing.

## II.

## THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION

 The plan is presumptively unconstitutional because its population deviation is 11.79%. Any redistricting plan that contains a population deviation above 10% is prima facie discriminatory. This is in accordance with the constitutional goal of "one person, one vote." According to the Commission, Plan L91 is the result of an attempt to keep together traditional neighborhoods and communities of interest while avoiding oddly shaped districts. The deviation in population results from the decision to maintain the integrity of Madison and Fremont Counties.

 "The Equal Protection Clause requires states to 'make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable.'" *Smith v. Idaho Commission on Redistricting*, 136 Idaho 542, 38 P.3d 121 (2001)(quoting *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964)).

A redistricting plan that deviates more than 10% in population among the districts is prima facie unconstitutional under the Equal Protection Clause. *Brown v. Thomson*, 462 U.S. 835, 842–43, 103 S.Ct. 2690, 2695–96, 77 L.Ed.2d 214, 221–22 (1983). "The ultimate inquiry," after a prima facie case of discrimination has been shown, is "whether the legislature's plan 'may reasonably be said to advance a rational state policy' and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits.'" *Id.* at 843, 103 S.Ct. at 2696, 77 L.Ed.2d at 222 (quoting *Mahan v. Howell*, 410 U.S. 315, 328, 93 S.Ct. 979, 987, 35 L.Ed.2d 320, 332 (1973)).

In the 1980's, this Court held that a redistricting plan violated the Equal Protection Clause, stating that "[a] plan with larger disparities in population ... creates a prima facie case of discrimination and therefore must be justified by the State." *Hellar v. Cenarrusa*, 106 Idaho 586, 589, 682 P.2d 539, 542 (citing *Swann v. Adams*, 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501, 504–05 (1967)). Unlike Plan L66, for which the state presented no evidence to justify the 10.69%, the Commission does seek to justify the greater disparity in L91 as the result of an advancement of rational state policies.

The Commission asserts that L91 advances the policy contained in Article III, § 5 of the Idaho Constitution and Idaho Code § 72–1506(5) by not splitting Madison and Fremont Counties. The second policy advanced is that the plan honors Idaho Code § 72–1506(2) by preserving traditional neighborhoods and communities of interest.

Clearly there is a state interest in keeping counties whole. *E.g.*, I.C. § 72–1506(5). Keeping Madison and Fremont Counties whole is consistent with that policy. However, both Bingham and Bannock counties have been split into three districts. The political integrity of Madison and Fremont Counties has been addressed. The same principle has not been applied to Bingham and Bannock Counties.

The second policy advanced by the Commission is that Plan L91 satisfies the goal set

forth in I.C. § 72–1506(2) by preserving traditional neighborhoods and local communities of interest. The Commission admits that Plans L76 and L69 both contained population deviations of less than 10%, but that these plans would have divided Fremont County by placing Island Park in District 35, a geographically large district that stretches from Challis to near Island Park. These plans were proposed, but the residents in Madison and Fremont County wished to retain Island Park within their district, and the Commission felt that the 11.79% population deviation was acceptable in light of this decision.

It is true that maintaining traditional neighborhoods and local communities is a goal under I.C. § 72–1506(2). However, it appears that the communities of interest of Madison County and Fremont County have been considered over those of Bingham and Bannock County, which argue that Plan L91 splits traditional neighborhoods and local communities within their districts. This is particularly notable in light of the fact that the split of Island Park would have encompassed some 828 people, whereas the three-way splits of Bingham and Bannock counties involve substantially more people.

This Court ordered the Commission to submit any proposed plans that contained a population deviation of less than 10%. The Commission attached twenty-one such plans that were considered by the Commission. The population disparity in these plans varies from as low as 4.54% (Plan L06) to as high as 9.98% (Plan L68). The Commission sent out public notices regarding many plans, including plans L59–66, L69, and L76. It appears that Plans L69 and L76 were the two plans most seriously considered by the Commission. The population deviation in these two plans was 9.98% and 9.71%, respectively. These plans were not adopted, the Commission argues, because they would have split Fremont County by placing Island Park in District 35, and the residents of Madison and Fremont County preferred not to split the counties.

■ Some redistricting plans that have been drafted to maintain the integrity of political subdivisions have withstood constitutional scrutiny despite population deviations in excess of 10%. *See, e.g., Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). In *Mahan,* the United States Supreme Court upheld a redistricting scheme with a population deviation of 16.4% because it found that the plan at issue maintained the integrity of political subdivisions. In the present case, however, it appears that the integrity of some political subdivisions has been maintained, while the political integrity of others has not been maintained. The justification for the deviation is not sufficient when it is based upon a policy that has not been applied consistently. This inequality without sufficient justification does not withstand scrutiny even in light of *Mahan.*

## III.

## THE RELATIONSHIP BETWEEN IDAHO CODE § 72–1506(5) AND ARTICLE III, § 5 OF THE IDAHO STATE CONSTITUTION

Bingham and Bannock County argue that the redistricting statute, Idaho Code § 72–1506(5) is unconstitutional, specifically that it violates the provisions of Art. III, § 5 of the Idaho Constitution, which provides the following:

A senatorial or representative district, when more than one county shall constitute the same, shall be composed of contiguous counties, and a county may be divided in creating districts only to the extent it is reasonably determined by statute that counties must be divided to create senatorial and representative districts which comply with the constitution of the United States. A county may be divided into more than one legislative district when districts are wholly contained within a single county. No floterial district shall be created. Multi-member districts may be created in any district composed of more than one county only to the extent that two representatives may be elected from a district from which one senator is elected. The provisions of this section shall apply to any apportionment adopted following the 1990 decennial census.

I.C. § 72–1506 provides the following:

Criteria governing plans.—Congressional and legislative redistricting plans consid-

ered by the commission, and plans adopted by the commission, shall be governed by the following criteria:

(1) The total state population as reported by the U.S. census bureau, and the population of subunits determined therefrom, shall be exclusive permissible data.

(2) To the maximum extent possible, districts shall preserve traditional neighborhoods and local communities of interest.

(3) Districts shall be substantially equal in population and should seek to comply with all applicable federal standards and statutes.

(4) To the maximum extent possible, the plan should avoid drawing districts that are oddly shaped.

(5) Division of counties should be avoided whenever possible. Counties should be divided into districts not wholly contained within that county only to the extent reasonably necessary to meet the requirements of the equal population principle. In the event that a county must be divided, the number of such divisions, per county, should be kept to a minimum.

(6) To the extent that counties must be divided to create districts, such districts shall be composed of contiguous counties.

(7) District boundaries should retain, as far as practicable, the local voting precinct boundary lines to the extent those lines comply with the provisions of section 34–306, Idaho Code.

(8) Counties shall not be divided to protect a particular political party or a particular incumbent

It is clear that if the State Constitution and a statute conflict, the State Constitutional provision prevails. It is also clear that if a State Constitutional provision or statute conflicts with the United States Constitution, the United States Constitutional provision prevails.

■ Article III § 5 of the Idaho Constitution limits the division of counties to create legislative districts to those situations in which splitting the county is necessary to meet standards of equal protection; that is, one person, one vote. Obviously, to the extent that a county contains more people than

allowed in a legislative district, the county must be split. However, this does not mean that a county may be divided and aligned with other counties to achieve ideal district size if that ideal district size may be achieved by internal division of the county. Whether desirable or not, that is the meaning of Article III, § 5. A county may not be divided and parsed out to areas outside the county to achieve ideal district size, if that goal is attainable without extending the district outside the county. Similarly, the other considerations set forth in § 72–1506 are subordinate to the limitations of Article III, § 5.

■ In sum, the need to comply with the standards of equal protection in the United States Constitution is paramount. In approaching that goal, Article III, § 5 of the Idaho Constitution is the beginning point. A plan must begin with the premise that the counties will not be split unless it is necessary to meet standards of equal protection. If it is necessary to go outside county boundaries to form a district, considerations in § 72–1506 come into play, such as joining communities of interest and avoidance of oddly shaped districts. Those are factors to be considered, but they are subordinate to the Constitutional standard of voter equality and the restrictions in the Idaho Constitution upon splitting counties except to achieve that voter equality.

## IV.

## THE DIVISIONS IN L91

The petitioners argue that L91 violates Article III, § 5 of the Idaho Constitution. It is clear that splitting some counties is necessary to create districts that comply with equal protection principles in the U.S. Constitution. The next issue is whether there are divisions within L91 that are not necessary to meet equal protection standards in violation of the Article III, § 5 restraint upon dividing counties.

It is undisputed that the following counties must be split under a new redistricting scheme: Ada, Bannock, Bingham, Bonneville, Canyon, Kootenai, and Twin Falls. Each has too large a population for the ideal district.

It is apparent, also, in a state with 44 counties and 35 legislative districts that joining counties or parts of counties with one another is necessary. However, to the extent possible, counties should not be split, or the splits should be kept to the minimum possible while meeting equal protection standards. Analysis of L91 yields interesting information.

Plan L91 divides Power County into two legislative districts Districts 27 and 29. The Commission found that Power County's population was insufficient to constitute a single district. Therefore, it could have been combined with another county or counties and not have been divided.

> However, in order to address the populations of Power, Cassia, Oneida, Franklin, Bear Lake, Caribou, Bingham and Bannock Counties in a way that meet both the one person/one vote requirements of the United States Constitution and the community of interest provision of Idaho Code § 72–1506(2) the Commission divided the population of Power County between two districts in the proposed plan. The Power County population in American Falls and the northeastern portion of the county was combined in District 29 with the Fort Hall precinct in Bingham County and the northern portions of Bannock County. Although the Commission considered many plans that did not divide Power County, this approach was necessary to accommodate the remainder of Bannock County's population after District 30 was created out of the Pocatello area and southern Bannock County was placed in District 28 with Oneida, Franklin, Bear Lake and Caribou Counties to create a more compact district. The remainder of Power County was combined with Cassia and portions of Bingham County to satisfy the contiguous requirement of the Idaho Constitution and to provide additional population to satisfy the one person/one vote requirement of the United States Constitution. This division of Power County also kept all populated portions of the Fort Hall Indian Reservation in one legislative district in furtherance of the "communities of interest" provision of Idaho Code § 72–1506(2).

Plan L91 divides Bannock County into three legislative districts Districts 28, 29, and 30. Bannock County's population requires that it be split. However, the Commission made the following findings regarding Bannock County:

> **Bannock County has sufficient population for two districts wholly contained within the county with no remainder to be combined with another county or counties.** The approved plan creates one district wholly contained within the county. This is District 30 which is most of Pocatello. Instead of creating a second district from the remaining Bannock County population, as was considered by the Commission, the adopted plan divided that remaining Bannock County population between two other districts. Southern Bannock County was combined in District 28 with Oneida, Franklin, Bear Lake and Caribou Counties to create a more compact district with a greater common community of interest than in many other plans considered by the Commission (Idaho Code § 72–1506(2)). The northern portion of Bannock County not in District 30 was combined with the Fort Hall precinct in Bingham County and with northeastern Power County for the reasons stated in the Power County finding. This allocation of Bannock County between Districts 28, 29 and 30 creates districts which satisfy the one person/one vote requirement of the United States Constitution. Other plans were not adopted by the Commission because some felt that District 28 in those places, which combined Oneida, Franklin, Bear Lake, Caribou, eastern Bonneville and Teton Counties, violated Idaho Code § 72–1506 because it was too oddly shaped and did not constitute a local community of interest. (emphasis added).

In Plan L91 Bingham County is divided into three districts—Districts 27, 29, and 31. Bingham County's population requires that it be split. The Commission made the following findings regarding Bingham County:

> Bingham County's population is too great for one self-contained district and too little for two self-contained districts. Therefore, Bingham has to be divided to comply with

the United States Constitution. The ideal would be to create one wholly self-contained district in Bingham County and combine the portions of the county with another county or counties in another district. The approved plan does not do this. **Rather, Bingham County is divided among three districts, each combining other counties or portions of counties.** Most of western Bingham County west of the Snake River is combined with Cassia and a portion of Power County in District 27. These areas have a common agricultural community of interest, although the Bingham County Commissions made clear in their desire that most of this area would be kept with the Blackfoot area. The Commission found no reasonable way to accommodate this request and still comply with the one person/one vote requirement of the United States Constitution. The Fort Hall Precinct in southern Bingham County is placed with the other populated portion of the Fort Hall Indian Reservation in northern Bannock County and eastern Power County for the reasons stated in the Power County finding. Blackfoot and the remainder of Bingham is placed in District 31 with those portions of Bonneville which surround Idaho Falls to the west and south. These areas have common agricultural and other communities of interest along with the Interstate 15 corridor between Blackfoot and Idaho Falls. (emphasis added).

■ It appears that the Commission's focus in splitting these counties is to maintain traditional neighborhoods and communities of interest while avoiding oddly shaped districts and still maintaining the one person/one vote standard. Those are laudable statutory goals, but they are subordinate to the threshold standard of Article III, § 5 that counties may not be divided unnecessarily. That is the baseline for consideration within the state system—trumped only by the Constitutional need for equal protection.

## V.

## OTHER ISSUES

The petitioners have raised other issues concerning the validity of L91. The Court will address these issues for possible guidance to the Commission in further planning.

### A. Idaho Code § 72–1506(4)

■ Section 1506(4) states that "to the maximum extent possible, the plan should avoid drawing districts that are oddly shaped." The petitioners argue that District 27 is an odd "C" shape. Because there were other proposed plans that did not create an oddly shaped District 27, the petitioners argue, Plan 91 violates this statute.

The statute does not define the term "oddly shaped." In *Hellar v. Cenarrusa,* 106 Idaho at 591, 682 P.2d at 544, this Court stated that "shoestring connections, odd-shaped narrow districts, dispersion of urban populations into larger rural areas and the unnecessary splitting of established areas" could be evidence of gerrymandering. In the racial gerrymandering context, the United States Supreme Court has identified several factors that may lead a court to believe a district is oddly shaped. These include the degree of a district's compaction; whether the various portions of the district are contiguous with one another; and the extent to which districts respect political subdivisions. *Shaw v. Reno,* 509 U.S. 630, 647, 113 S.Ct. 2816, 2826–27, 125 L.Ed.2d 511, 528–29 (1993). Federal courts have held that districts are oddly shaped when they are "distorted" or "elongated." *Diaz v. Silver,* 978 F.Supp. 96, 118 (E.D.N.Y.1997).

The Commission correctly argues that the district does not have a "shoestring section" or a narrow shape. It contains mostly rural areas. It is a fairly large district but not very far out of the ordinary when compared to other districts. It is not very "elongated." The district does, however, contain a "C" shape at one end that gives it somewhat of a different shape. The question then is whether this by itself creates an oddly shaped district. There is no evidence that residents of the communities within the district contain different interests or that the district was drawn in order to discriminate. Further, the statute does not forbid the creation of an "oddly shaped" district, it merely states that this should be avoided when possible. Look-

ing at the other proposed plans in the record, District 27 looks more or less the same. District 27 does not violate this statute.

## B. Idaho Code § 72–1506(7)

Section 72–1506(7) states that "district boundaries should remain, as far as practicable, the local voting precinct boundary lines to the extent those lines comply with the provisions of section 34–306, Idaho Code." The petitioners argue that Plan 91 divides two precincts in Bingham County and places one in District 27 and one in District 29. Because there were other proposed plans that did not split the precinct, the petitioners argue that Plan 91 violates this statute.

The Commission admits that some precincts have been divided, but that some precincts must be divided under any new redistricting scheme. This is certainly true. The fact that a plan splits one precinct is not fatal under this statute. Some precincts are going to have to be split, and the statute only requires that this be avoided "as far as practicable."

## C. Idaho Code § 72–1506(2)

Section 72–1506(2) states that "to the maximum extent possible, districts shall preserve traditional neighborhoods and local communities of interest." The Bingham County petitioners argue that the communities of Riverside, Moreland, Rockford, Thomas, and Pingree, which are located near Blackfoot, will become part of District 27 with Cassia County, while Blackfoot will become part of District 31. Because there were other proposed plans that did not split these communities, the Bingham County petitioners argue that the plan violates the statute. The Bannock County petitioners argue that the communities of Pocatello, Inkom, McCammon, and Lava Hot Springs should have been kept together.

The statute does not define what a "traditional neighborhood" or a "local community of interest" is. The United States Supreme Court has offered the following guidance; including whether the residents in the district regard themselves as a community; whether the residents in the district live in a urban or rural areas; and whether tentacles, appendages, or parts of the district share common transportation lines and media sources. *See, e.g., Lawyer v. Dep't of Justice,* 521 U.S. 567, 581–82, 117 S.Ct. 2186, 2195, 138 L.Ed.2d 669, 682–84 (1997); *Bush v. Vera,* 517 U.S. 952, 966, 116 S.Ct. 1941, 1955, 135 L.Ed.2d 248, 261–62 (1996).

The Commission argues that it worked to satisfy the concerns addressed in the challenge to the first redistricting plan in creating the current plan. For example, the Commission argues that the communities of Firth, Shelley, and Basalt, which were previously divided, are now placed in a single district, and that the Fort Hall Indian Reservation has been maintained as a single district. The Commission also argues that Riverside, Thomas, Moreland, Pingree and Rockford have been kept together. It is clear that the closest major population area to these small communities is Blackfoot and that Blackfoot has been placed in a different district than these communities.

When considering the Bannock County petition, it is important to note that the areas in dispute share a common media, they are all in the Sixth Judicial District, and they are connected by Interstate 84. The Commission also argues that from 1966 through 1992 that Bannock County had at all times been joined with one or more, and currently all, of the counties of Oneida, Franklin, Bear Lake and Caribou. The plan appears to honor traditional neighborhoods. However, any decision on the validity of these alignments is moot in light of the Court's decision concerning the effect on Article III, § 5 of the Idaho Constitution.

## VI.

## CONCLUSION

Plan L91 contains a population deviation of 11.79%, well above a prima facie showing of a violation of equal protection standards. The Commission justifies this deviation on the basis that it occurs as the result of an advancement of rational state policies, particularly maintenance of the integrity of political subdivisions Madison and Fremont Counties.

Article III, § 5 of the Idaho Constitution prohibits the division of counties, except to meet the constitutional standards of equal protection. The prohibition was honored by the Commission with respect to Madison and Fremont Counties, but Article III, § 5 was not honored as to Bingham and Bannock Counties. In those instances, the idea of joining communities of interest has prevailed over the requirement of maintaining county integrity except to achieve equal protection. The basis for justifying the population deviation in L91 is not consistent with other decisions made by the Commission which did not honor the integrity of political subdivisions.

The Commission is directed to reconvene to adopt a redistricting plan consistent with constitutional standards of equal protection and to the extent possible the dictates of Article III, § 5 of the Idaho Constitution. In the event the delay occasioned by this directive interferes with the time limits for candidate filing, the Court will consider any requests for remedial order. The petitioners are awarded costs. No attorney fees are allowed.

Chief Justice TROUT, Justices KIDWELL and EISMANN, concur.

Justice WALTERS, DISSENTING.

In *Smith v. Idaho Commission on Redistricting*, 136 Idaho 542, 546, 38 P.3d 121, 125 (2001), we held that the redistricting plan proposed at that time by the Commission, L66, "violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the population of its districts varies more than 10% constituting a prima facie case of discrimination and the State has offered no evidence of legitimate reasons for the deviation." The key to this determination was the lack of any explanation by the Commission that set forth a rational basis for the population variance in the proposed redistricting plan.

Following the decision in *Smith*, the Commission reconvened and thereafter proposed a new plan, L91. The petitioners have now challenged that plan, arguing that it too violates the equal protection provision of the United States Constitution, as well as Article

III, § 5 of the Idaho Constitution and pertinent statutory provisions. A majority of this Court agrees with those challenges. I disagree.

The Commission, in my opinion, corrected the deficiency found by this Court in Smith, and did not create another plan subject to constitutional or statutory imperfections.

The rationale for the new plan was expressed by the Commission in its findings and conclusions as follows:

The United States Constitution has been interpreted by the United States Supreme Court to require that legislative districts be formed after each census with substantially equal population to satisfy the one person/one vote requirement. State legislative redistricting plans of less than 10% deviation between the most populous and least populous districts are presumed to satisfy the federal constitutional requirement. *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). Redistricting plans with greater than 10% population deviation can be justified only if such additional deviation is required to further a "rational state policy." Id. at 328–329, 93 S.Ct. at 986–87, 35 L.Ed.2d at 332. In *Mahan* the United States Supreme Court upheld a legislative redistricting plan with a 16.4% deviation because it furthered the state "policy of maintaining the integrity of political subdivisions." 410 U.S. at 319, 329, 93 S.Ct. at 982–83, 987, 35 L.Ed.2d at 327, 333.

With this premise stated, the Commission next reviewed the provisions of Article III, § 5 of the Idaho Constitution and the statutory provisions set forth in Idaho Code § 72–1506 relating to the creation of a redistricting plan. The Commission stated:

The Commission believes that the Idaho Constitution's provisions regarding the division of counties in the formation of legislative districts constitutes a rational state "policy of maintaining the integrity of political subdivisions" within the meaning of *Mahan* that justifies a deviation between districts of up to 16.4%. The deviation in the redistricting plan adopted by the Commission is justified by this rational state policy of maintaining the integrity of coun-

ty boundaries contained in Art. III § 5 of the Idaho Constitution.

. . . .

Some members of the Commission believe that Article III § 5 of the Idaho Constitution prohibits the division of counties unless absolutely necessary to satisfy the one person/one vote requirement of the United States Constitution. Additionally they believe that the Idaho Constitution requires that the maximum number of districts be wholly created within any county whose population supports them, e.g.s, a county could not be divided at all if its population equaled two ideal districts, or if its population equaled two ideal districts plus 8,000 persons, the county must have two self contained districts with only this surplus being subject to division. Other members of the Commission believe that the Idaho Constitutional provisions are to be read together with the statutory provisions of Idaho Code § 72–1506 in a way that respects as may be reasonably possible the limitations on division of counties while at the same time honoring the principle of one person one vote, and to the maximum extent possible, endeavoring to preserve traditional neighborhoods and local communities of interest and to avoid odd shapes. Plan L91, the redistricting plan adopted by the Commission, is justified by this latter view of the constitutional and statutory requirements.

The Commission considered the unique physical features of our State that bore upon the daunting task of creating legislative district that would pass constitutional and statutory muster. The Commission wrote:

There are several physical factors which complicate redistricting in Idaho. The unique shape of the state limits the combinations of contiguous counties that can be combined to create legislative district. The geography of Idaho (wilderness areas, mountain ranges, deserts and rivers) in some cases limit the ideal combination of certain counties in the creation of legislative districts. The low population density of many counties limits the ideal combination of certain counties in the creation of legislative districts. The fact that most of the external boundaries of Idaho (with the exception of certain areas on the western border) run through very sparsely populated areas limits the ideal combination of counties in the creation of legislative districts. For redistricting purposes, Idaho is the exact opposite of the rectangular shaped state whose population is evenly distributed over flat farmland. The federal one person/one vote requirement, the Idaho Constitution's limitation on the number of districts, the Idaho Constitution's limitation on the division of counties in the formation of legislative districts, and these unique physical features necessarily result in the creation of a few legislative districts that are not ideal under any redistricting plan.

After concluding that a plan containing thirty-five legislative districts, as permitted by Art. III § 2 of the Idaho Constitution, would be the most reasonable, the Commission next addressed the division of counties in order to arrive at the best plan. The Commission reported:

In a thirty-five district plan two counties have such populations that they can constitute single districts by themselves without combination with any other county or portion of another county. They are Latah and Nez Perce Counties. Three counties could be divided into districts wholly within that county that meet the one person/one vote requirement without having to combine any portion of that county with any other county or portion of another county. They are Ada (8 districts), Bannock (2 districts) and Kootenai (3 districts). Four counties are of such population that one or more districts can be created solely within the county, but a portion of the county must be combined with other counties to meet the one person/one vote requirements. They are Bingham (1 whole, 1 partial), Bonneville (2 whole, 1 partial), Canyon (3 whole, 1 partial), and Twin Falls (1 whole, 1 partial). The remaining thirty-five counties are so sparsely populated that they must be combined with other counties to create districts of sufficient population to comply with the federal constitutional requirement of one person/one vote. One of those counties (Bonner) must be divided

and combined with contiguous counties because one neighboring county (Boundary) is not contiguous to any other county. Boundary County is so small that it cannot constitute a district by itself which satisfies the one person/one vote requirement and when Boundary and Bonner Counties are combined undivided they are too large to constitute a district which complies with the one person/one vote requirement.

The Commission then made specific findings regarding those counties which the Commission determined should be divided in order to arrive at a plan that would comply with the constitutional requirements. With respect to the two counties who filed this action to challenge the plan adopted by the Commission—Bingham and Bannock—the Commission explained:

**Bannock County.** Bannock County has sufficient population for two districts wholly contained within the county with no remainder to be combined with another county or counties. The approved plan creates one district wholly contained within the county. This is District 20 which is most of Pocatello. Instead of creating a second district from the remaining Bannock County population, as was considered by the Commission, the adopted plan divided that remaining Bannock County population between two other districts. Southern Bannock County was combined in District 28 with Oneida, Franklin, Bear Lake and Caribou Counties to create a more compact district with a greater common community of interest than in many other plans considered by the Commission (Idaho Code § 72–1506(2)). The northern portion of Bannock County not in District 30 was combined with the Fort Hall precinct in Bingham County and with northeastern Power County for the reasons stated in the Power County finding. [In the Power County finding, the Commission concluded that Power County had insufficient population to constitute a single district and it would be in furtherance of the "communities of interest" provision of Idaho Code § 72–1506(2) to combine a portions of Power County with portions of Bingham and Bannock Counties in creating Districts 29 and 30.] This allocation of Bannock Coun-

ty between Districts 28, 29 and 30 creates districts which satisfy the one person/one vote requirement of the United States Constitution. Other plans were not adopted by the Commission because some felt that District 28 in those places, which combined Oneida, Franklin, Bear Lake, Caribou, eastern Bonneville and Teton Counties, violated Idaho Code § 72–1506 because it was too oddly shaped and did not constitute a local community of interest.

The Commission's determination with regard to Bingham County was also explained. The Commission said:

**Bingham County.** Bingham County's population is too great for one self-contained district and too little for two self-contained districts. Therefore, Bingham has to be divided to comply with the United States Constitution. The ideal would be to create one wholly self-contained district in Bingham County and combine the portions of the county with another county or counties in another district. The approved plan does not do this. Rather, Bingham County is divided among three districts, each combining other counties or portions of counties. Most of western Bingham County west of the Snake River is combined with Cassia [County] and a portion of Power County in District 27. These areas have a common agricultural community of interest, although the Bingham County Commissioners made clear in their desire that most of this area be kept with the Blackfoot area. The Commission found no reasonable way to accommodate this request and still comply with the one person/one vote requirement of the United States Constitution. The Fort Hall precinct in southern Bingham County is placed with the other populated portion of the Fort Hall Indian Reservation in northern Bannock County and eastern Power County for the reasons stated in the Power County finding. Blackfoot and the remainder of Bingham is placed in District 31 with those portions of Bonneville [County] which surround Idaho Falls to the west and south. These areas have common agricultural and other communities of inter-

est along with the Interstate 15 corridor between Blackfoot and Idaho Falls.

Having determined which counties should be divided as allowed by the Idaho Constitution, the Commission next explained its decision for the composition of each of the thirty-five districts. The districts containing portions of Bingham and Bannock Counties, which are now complained of by the petitioners, are districts 27, 28, 29, 30 and 31.

With respect to District 27 composed of Cassia County and portions of Power and Bingham Counties, the Commission noted that the portions were contiguous, were necessarily combined to satisfy the one person/one vote requirement although varying from the ideal district population by a minus 5.0%, but combined a community of interest with its population centers near the principal highways, irrigated agricultural and commercial areas.[1]

As to District 28, composed of Oneida, Franklin, Bear Lake, Caribou Counties and a contiguous portion of Bannock County, the Commission found that this combination provided a population that varied only 0.4% from the ideal district.[2] The Commission determined that although it may have been desirable not to divide Bannock County, the proposed configuration

> brings together a compact and contiguous collection of counties and a community of interest in matters of services, transportation and commerce while at the same time satisfying the requirements of one person, one vote. This configuration complies with Idaho Code Section 72–1506(2), and enjoyed support from some public officials and some citizens from within the district.

Similarly, with regard to District 29, which is composed of portions of Bannock, Bingham and Power Counties, including the bulk of the Native American population on the Fort Hall Indian Reservation, the Commission determined that the areas were contiguous, were a traditional neighborhood and contained a community of interest in culture and commerce. The Commission found that this combination of counties and communities of interest has a population which varies from the ideal district by 2.7%.[3]

District 30 is largely composed of the City of Pocatello. The Commission determined that this area had an obvious community of interest, was a traditional neighborhood and had a population variance of 3.2% from the ideal district.[4]

Finally, with respect to proposed District 31, which combined a portion of Bingham County with southern Bonneville County, the Commission stated that it was a contiguous area, represented a community of interest and traditional neighborhood with population centers located at Blackfoot, Firth, Shelley and a contiguous part of Bonneville County near Idaho Falls. The Commission noted that "[w]ith portions of Bingham County having been used to balance the population in Districts 27 and 29, the remaining population, while substantial, still needed a portion of Bonneville County to create a district population which varies from the ideal by 3.9% to satisfy the one person, one vote requirements."[5]

In accomplishing its task, the Commission noted, it endeavored throughout to retain as far as practicable the local voting precinct boundary lines.

---

1. The ideal district, based on the total population reported in the 2000 census, would consist of 36,970 people. Under Plan L91, each of the legislators in District 27 would represent 35,132 people, or 1838 less than the ideal district.

2. Compared with an ideal district of 36,970, each legislator in District 28 would represent 37,114 people, or 144 more people than the ideal district.

3. Compared with an ideal district of 36,970, each legislator in District 29 would represent 37,954 people, or 984 more than the ideal district.

4. Compared with the ideal district of 36,970, each legislator in District 30 would represent 38,158 people, or 1188 more than the ideal district.

5. Compared with the ideal district of 36,970, each legislator in District 31 would represent 38,411 people, or 1441 more than the ideal district.

The United States Supreme Court has concluded that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of the legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964). "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal protection principle are constitutionally permissible in either or both of the two houses of a bicameral state legislature." *Id.* at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537. "[I]t is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964).

Here, I submit, there was a good faith and honest effort by the Commission to propose a legislative redistricting plan free from the taint of arbitrariness or discrimination. The Commission fully and fairly explained the considerations that went into Plan L91. The Commission articulated a rational basis for its decision. The result is entitled to substantial deference by the courts upon review. *Brown v. Thomson*, 462 U.S. 835, 847–48, 103 S.Ct. 2690, 2698–99, 77 L.Ed.2d 214, 224–25 (1983).

Furthermore, given the detailed explanations presented by the Commission to support their decision for the acceptance of Plan L91, I do not find the population deviation represented by the plan to be violative either of the constitutions or the statutes. As pointed out in *McBride v. Mahoney*, 573 F.Supp. 913, 915 n. 6 (D.Mont.1983), appor-

tionment plans where there have been deviations in excess of 10% have been approved in many recent cases, including *Brown v. Thomson, supra,* (Wyoming House of Representatives, maximum deviation 89%), *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (Virginia House of Representatives, maximum deviation 16.4%); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399(1971) (Rockland County, New York, maximum deviation 11.9%); *Wold v. Anderson,* 335 F.Supp. 952 (D.Mont.1971) (Montana Senate, maximum deviation 10.95%); *League of Nebraska Municipalities v. Marsh,* 253 F.Supp. 27 (D.Neb.1966) (Nebraska House of Representatives, maximum deviation 19.65); *Sims v. Baggett,* 247 F.Supp. 96 (M.D.Ala.1965) (Alabama Senate, maximum deviation 25.7%).

I conclude that the challenges raised by the petitioners should be denied and that Plan L91 as submitted by the Commission should be permitted to go into effect.